Felicia Medina (SBN 255804)
fmedina@medinaorthwein.com
Jennifer Orthwein (SBN 255196)
jorthwein@medinaorthwein.com
Kevin Love Hubbard (SBN 290759)
khubbard@medinaorthwein.com
MEDINA ORTHWEIN LLP
1322 Webster Street, Suite 200
Oakland, CA 94612
Telephone: (510) 823-2040
Facsimile: (510) 217-3580

*Attorneys for Plaintiff Candice Crowder*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRISTAIN "CANDICE" CROWDER,<br><br>**Plaintiff,**<br><br>v.<br><br>RALPH DIAZ; ROBERT W. FOX; CHRISTOPHER TILESTON; FELIX X. HOPPER; RONALD HADRAVA; S. CHERNISS; C. SANTOS; D. GIBBS; FABIENNE FARMER; BRANDY EBERT; AND DOES 1-3,<br><br>**Defendants.** | Case No.: 2:17-cv-01657<br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br><br>Action filed: August 7, 2017 |

FIRST AMENDED COMPLAINT

Plaintiff Candice (a/k/a Tristain) Crowder ("Plaintiff" or "Ms. Crowder"), by and through her attorneys, Medina Orthwein LLP, brings this action against Ralph Diaz, Robert W. Fox, Christopher Tileston, Felix X. Hopper, Ronald Hadrava, S. Cherniss, C. Santos, D. Gibbs, Farmer, Brandy Ebert, and Does 1-3 ("Defendants"), as applicable, under 42 U.S.C. Section 1983 for violations of the First, Eighth, and Fourteenth Amendments of the Constitution of the United States.

## I.    **INTRODUCTION**

1.      Plaintiff is a 33-year-old, Black, bisexual, transgender woman.[1]  She has endured extreme abuse, trauma, discrimination, and retaliation while in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), including being raped, being attacked with a box cutter, receiving death threats, having her many cries for help ignored, and being deliberately placed in harm's way by correctional staff.

2.      Within months of being under the custody of CDCR, correctional staff forced Ms. Crowder into a cell with an openly transphobic male prisoner.  When she informed correctional staff that she did not feel safe housed with an individual known to overtly express hostility toward transgender people, she was thrown in the cell and brutally beaten by correctional staff.  Ms. Crowder was eventually transferred to another CDCR facility, where she was housed with a prisoner who pressured her to perform sex acts on him.  Ms. Crowder managed to escape this sexual abuser with the assistance of a transgender prisoner in a leadership role; however, correctional staff re-housed Plaintiff with her sexual abuser six days later. Ms. Crowder was then violently raped by this cellmate.  Following the rape, correctional staff refused to report or investigate it and denied Ms. Crowder medical attention.  Ms. Crowder was also shockingly and inhumanely treated by correctional staff and placed in solitary confinement for approximately nine months.

3.      Ms. Crowder was then transferred to the California Medical Facility ("CMF") in September 2016.  Within days of arriving at CMF, Ms. Crowder was threatened by her ex-boyfriend, another former abuser, who was also incarcerated at CMF.  She reported the threat to a Sergeant – Defendant C. Santos.

---

[1] The term "transgender" is commonly used as an umbrella term that refers to people whose gender identity is different from their assigned sex at birth.  Plaintiff's preferred name ("Candice Crowder") and female pronouns should be used to refer to her.

Due to Defendant Santos's inaction, Ms. Crowder's ex-boyfriend violently assaulted her with a box cutter in the dining hall two days later.  Following this incident, Ms. Crowder was blamed for the assault.  According to correctional staff, it was her fault for *choosing* to live a transgender "lifestyle."  She was "asking for it."   Ms. Crowder reported this misconduct to no avail, catalyzing an escalating campaign of retaliation and leaving her with no other choice but to seek relief from litigation.

4.      Ms. Crowder's experiences shed light on the severe discriminatory treatment transgender women face within CDCR institutions.  Physical and sexual abuse are rampant in prisons today and lesbian, gay, bisexual, transgender, queer, and intersex ("LGBTQI") people are among those most at risk.  To address this crisis, Congress unanimously passed the Prison Rape Elimination Act ("PREA") in 2003.  In accordance with PREA, nearly a decade of research and data collection on sexual assault in prison ensued.  The research indicated that while anyone can become the victim of violence in prison, transgender and gender-nonconforming people are at a significant risk.   Indeed, a study of California prisons commissioned by CDCR found that transgender women in men's prisons are over 13 times more likely to be sexually assaulted than other prisoners.[2]

5.      After nearly a decade of study and review, the U.S. Department of Justice issued final standards ("PREA Standards") in May 2012.  Although California has implemented most of the PREA Standards, it still has not implemented most of the federal standards that specifically address and attempt to mitigate violence against LGBTQI prisoners, especially those related to screening, housing placements, and solitary confinement.

6.      Under the PREA Standards, facilities must screen all individuals at admission and upon transfer to assess their risk of experiencing abuse, including identifying those who may be at risk because of their transgender identity, gender nonconformity, sexual orientation, or intersex condition.  28 C.F.R. § 115.41.  Decisions about where a transgender person is housed must be made on a case-by-case basis; they cannot be made solely on the basis of a person's anatomy or gender assigned at birth.  Furthermore, a transgender individual's views regarding their personal safety must be seriously considered.  *Id*. at § 115.42.  Under current CDCR policies and practices, and as illustrated in Plaintiff's experiences in CDCR

---

[2] Center for Evidence-Based Corrections, *Transgender Inmates in California's Prisons: An Empirical Study of a Vulnerable Population*, (April 8, 2009).

custody and the 2017 federal PREA audit, transgender prisoners' own perception of safety is not even considered when screening and making housing placement and programming decisions.

7. PREA research exposed the heightened risk of sexual assault against LGBTQI prisoners and the atypical severity of punishments LGBTQI people face solely for being themselves. Failure to implement the specific PREA Standards designed to mitigate this population's vulnerability illustrates the top-down culture of disparate and discriminatory treatment LGBTQI prisoners face in California prisons.

8. Ms. Crowder's experience is consistent with this finding. When Ms. Crowder expressed fears for her safety, she was ignored or placed in solitary confinement, also referred to as administrative segregation.

9. CDCR policies and practices too often respond to the problem of abuse by placing survivors and those most at risk in Sensitive Needs Yards[3] or isolation, in violation of PREA. Solitary confinement increases transgender prisoners' risk for assault and harassment by prison staff.[4] The isolation that vulnerable prisoners endure, purportedly "for their own safety" only serves to destroy their mental health and ability to function, with consequences that will impact them for the rest of their lives.

10. There is a wealth of research indicating solitary confinement is a significant factor leading to a multitude of psychological effects, including hyper-sensitivity to external stimuli, hallucinations, panic attacks, obsessive thoughts, and paranoia.[5] The U.N. Special Rapporteur on torture concluded solitary confinement becomes "prolonged" at 15 days, after which the psychological effects may become irreversible.[6] By way of illustration, CDCR placed Ms. Crowder in solitary confinement for

---

[3] Nashelly Chavez, *California Prisons Phase Out 'Sensitive Needs' Yards. Critics See a Rough Transition*, (May 27, 2018), www.sacbee.com/news/local/crime/article211942034.html.

[4] Christine Peek, *Breaking Out of the Prison Hierarchy: Transgender Prisoners, Rape, and the Eighth Amendment*, 44 Santa Clara L. Rev. 1211, 1240 (2004) (citing Schwenk v. Hartford, 204 F.3d 1187, 1192 (9th Cir. 2000)) (transsexual plaintiff alleged attempted rape by a Washington state prison guard); Darren Rosenblum, *Trapped in Sing Sing: Transgendered Prisoners Caught in the Gender Binarism,* 6 Mich. J. Gender & L. 499, 525 (2000) (citing Meriwether, 821 F.2d at 410). *See also* James Robertson, *A Clean Heart and an Empty Head: The Supreme Court and Sexual Terrorism in Prison*, 81 N.C. L. Rev. 433, nt. 101, 446 (2003) ("Because transsexuality and homosexuality are often conflated, officials may also consider transgender inmates appropriate targets").

[5] Christy Carnegie Fujio, Kristine Huskey, and Mike Corradini, *Buried Alive: Solitary Confinement in the US Detention System*, Physicians for Human Rights (April 2013).

[6] Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 63rd Sess., UN Doc. A/63/175, 77 (July 28, 2008).

---

approximately nine months shortly after she was violently raped by another prisoner.

11.     To address prisons' tendency to use solitary confinement to protect transgender prisoners, the PREA Standards restrict such uses of "protective custody" by requiring that all available alternatives be assessed before placing a prisoner involuntarily in solitary confinement.   28 C.F.R. § 115.43. Alternatives might include relocating perpetrators, providing heightened supervision, changing housing placement or cellmates, placement in a single occupancy cell within the general population, or transfer from a men's facility to a women's facility or vice versa.

12.     Fear of retaliation and further contact with abusers are obstacles to reporting sexual abuse in confinement.   Despite these fears, Ms. Crowder persevered to report sexual and physical abuse and filed grievances related to those instances.   As a result, she has repeatedly been retaliated against in the form of long stints in solitary confinement, removal from safe housing, placement in close proximity to prior abusers, and multiple disciplinary actions based on false and/or frivolous allegations.   These retaliatory actions have made Ms. Crowder ineligible for early release under Proposition 57, resulting in the lengthening of her incarceration by at least a year and, therefore, her risk of further abuse.

## II.     THE PARTIES

13.     **Plaintiff Candice Crowder** (whose legal name is Tristain Crowder) is a transgender woman.  She is a resident of California, currently housed at Kern Valley State Prison in Delano, California. Ms. Crowder has been incarcerated under the custody of the CDCR since January 23, 2015.

14.     **Defendant Diaz** is or was the Secretary of CDCR.  Upon information and belief, Defendant Diaz is a resident of California.  As Secretary, Defendant Diaz has ultimate responsibility and authority for the operation of CDCR, including the administration and implementation of CDCR's policies and procedures.  Defendant Diaz is sued here in his official capacity.

15.     **Defendant Robert W. Fox** is or was the Warden of CMF.  Upon information and belief, Defendant Fox is a resident of California.  As Warden, Defendant Fox has ultimate and direct authority over CMF, including the administration and execution of policies and procedures and ensuring compliance with state and federal laws governing employees and prisoners.   Warden Fox also has supervisory authority over correctional staff.   Specifically, he has the ultimate authority to discipline, terminate, investigate, and transfer correctional staff as the "Hiring Authority."  He also has the ultimate authority to

oversee, review, and approve investigations into grievances and staff complaints as the "Reviewing Authority." Defendant Fox is sued here in his official and individual capacity, as applicable, for damages based on actions, inaction, or conduct taken or performed under the color of state law.

16.    **Defendant Christopher Tileston** is or was an Associate Warden at CMF.   Upon information and belief, Defendant Tileston is a resident of California.   As Associate Warden, Defendant Tileston is the second in command and has authority over CMF, including the administration and execution of policies and procedures, as well as state and federal laws governing employees and prisoners. Defendant Tileston is sued here in his official and individual capacity, as applicable, for damages based on actions, inaction, or conduct taken or performed under the color of state law.

17.    **Defendant Felix X. Hopper** is or was an Investigative Services Unit ("ISU") Lieutenant at CMF.   Upon information and belief, Defendant Hopper is a resident of California.   As an ISU Lieutenant, Defendant Hopper is responsible for investigating staff complaints and overseeing ISU staff. Defendant Hopper is sued here in his official and individual capacity, as applicable, for damages based on actions, inaction, or conduct taken or performed under the color of state law.

18.    **Defendant Ronald Hadrava** is or was a Lieutenant at CMF.   Upon information and belief, Defendant Hadrava is a resident of California.   As a Lieutenant, Defendant Hadrava is responsible for supervising Sergeants, preparing procedures and post orders, and supervising the housing, custody, and discipline of prisoners.   Defendant Hadrava also has the ultimate authority to place, keep, and remove prisoners from solitary confinement at CMF as the "Segregation Authority."   Defendant Hadrava is sued here in his official and individual capacity, as applicable, for damages based on actions, inaction, or conduct taken or performed under the color of state law.

19.    **Defendant S. Cherniss** is or was a Lieutenant at CMF.   Upon information and belief, Defendant Cherniss is a resident of California.   As a Lieutenant, Defendant Cherniss is responsible for supervising Sergeants, preparing procedures and post orders, and supervising the housing, custody, and discipline of prisoners.   Defendant Cherniss has also served as a Senior Hearing Officer.   As a Senior Hearing Officer, Defendant Cherniss oversees, facilitates, and recommends findings in disciplinary hearings about Rules Violation Reports.   Defendant Cherniss is sued here in his official and individual capacity, as applicable, for damages based on actions, inaction, or conduct taken or performed under the

color of state law.

20.     **Defendant C. Santos** is or was a Sergeant at CMF.   Upon information and belief, Defendant Santos is a resident of California.   As a Sergeant, Defendant Santos is responsible for supervising Correctional Officers, escalating prisoners' complaints to higher-ranked employees, and reporting irregular or suspicious occurrences and taking or recommending appropriate action.   Defendant Santos is sued here in his individual capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law.

21.     **Defendant D. Gibbs** is or was a Correctional Officer at CMF.   Upon information and belief, Defendant Gibbs is a resident of California.   As a Correctional Officer, Defendant Gibbs is responsible for supervising, escorting, grading, and searching prisoners, reporting irregular or suspicious occurrences and taking or recommending appropriate action, running to the scene of a disturbance or emergency, and disarming, subduing and/or restraining prisoners.   Defendant Gibbs is sued here in his individual capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law.

22.     **Defendant Fabienne Farmer** is or was the Principal of CMF's school, library, and gym programs.   Upon information and belief, Defendant Farmer is a resident of California.   Upon information and belief, Defendant Farmer oversees and supervises the staff, participating prisoners, prisoners assigned to work, and the programming at CMF's school, library, and gym programs.   Defendant Farmer is sued here in her individual capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law.

23.     **Defendant Brandy Ebert** is or was a Litigation Coordinator at CMF.   Upon information and belief, Defendant Ebert is a resident of California.   As a Litigation Coordinator, Defendant Ebert handles and arranges attorney visits and notary services, processes legal documents, serves legal documents, receives service of complaints and other legal documents on behalf of CMF employees, and corresponds with outside entities on legal and litigation matters related to the institution.   Defendant Ebert is sued here in her official and individual capacity, as applicable, for damages based on actions, inaction, or conduct taken or performed under the color of state law.

24.     **Defendants Does 1-3** are sued under aliases because their identities are unknown to

Plaintiff.  Upon information and belief, Defendants Does 1-3 are residents of California.  Defendants Does 1-3 are or were Correctional Officers at CMF.  As Correctional Officers, Defendants Does 1-3 are responsible for supervising, escorting, grading, and searching prisoners, reporting irregular or suspicious occurrences and taking or recommending appropriate action, running to the scene of a disturbance or emergency, and disarming, subduing and/or restraining prisoners.  Defendants Does 1-3 are sued here in their individual capacities for damages based on actions, inaction, or conduct taken or performed under the color of state law.

25.    Plaintiff reserves the right, consistent with applicable rules and orders, to amend this complaint to include other officials and parties as legally necessary and for the Court to grant the injunctive relief requested herein.

### III.    JURISDICTION

26.    This Court has jurisdiction over the claims pursuant to 42 U.S.C. Sections 1331 and 1343(a)(3).

27.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. Section 1391(b)(2).  The events giving rise to the claims occurred in this District.

28.    Plaintiff has exhausted all administrative remedies with respect to the claims herein.

### IV.    FACTUAL ALLEGATIONS

**A.    Since Entering CDCR Custody in 2015, Correctional Staff Have Repeatedly, Knowingly, and Deliberately Placed Plaintiff in Danger and Ignored Her Pleas for Safety and Reports of Abuse**

29.    Within months of entering CDCR in January 2015, Ms. Crowder was beaten by guards at North Kern State Prison ("NKSP") for expressing safety concerns over being housed with a prisoner who was openly transphobic.  She suffered bruising, a seizure, and permanent scarring from the beating.  She was refused medical attention after the battery and subsequent seizure.

30.    Ms. Crowder was then transferred to the California Substance Abuse Treatment Facility in August 2015, where she was placed in a cell with a prisoner who immediately began verbally abusing her and pressuring her to perform sex acts on him.  After enduring this for nearly two weeks, a transgender prisoner in a leadership role helped her transfer to another cell on August 18, 2015.  Upon information and belief, correctional staff placed Ms. Crowder back in her abuser's cell at his request on August 24,

2015.

31.     On September 13, 2015, Ms. Crowder was violently raped by her cellmate.  She suffered severe anal fissures from the attack that still cause discomfort and pain today.

32.     Ms. Crowder made every effort to report the sexual assault to custody officers and obtain medical treatment, but her reports and requests were ignored.  She specifically reported the sexual assault to Correctional Officer S. Davis and Correctional Officer A. Garcia on September 14, 2015, the day after the rape.  Ms. Crowder also informed Sergeant D. W. Andres and Lieutenant Babbs.  No investigation was conducted until nearly four months after the rape, when Ms. Crowder reported it to her psychologist, who then filed a formal PREA report.

33.     During the investigation, Ms. Crowder requested charges be brought against the rapist.  She also requested medical attention but was refused by the investigators, who told her it was unnecessary because the incident had occurred over four months prior.  Ms. Crowder wanted treatment for the anal fissures that were a result of the sexual assault.  She did not receive treatment for these injuries until late 2016.

34.     Despite many attempts to get updates on the investigation, Ms. Crowder did not receive an update until November 2018.  At that time, Ms. Crowder learned the "investigation" had been conducted and closed within 1-2 days.

**B.     Plaintiff Has Been Subjected to Multiple Lengthy Periods of Solitary Confinement and Loss of Privileges Based on False Reports by Officers, and For Reporting Legitimate Safety Concerns**

35.     Following the sexual assault, Ms. Crowder received multiple Rules Violation Reports ("RVRs") and disciplinary Chronos (also known as CDCR Form 128-B) from correctional officers, including for wearing a hat to the yard and for hugging another prisoner.  Tellingly, one of these RVRs was issued to Ms. Crowder for expressing safety concerns about being placed in a cell with a specific prisoner, indicating he had been her cellmate before and "he was harassing and sex playing me."  She also reported she "feared for her life."  The RVR was for "Willfully Delaying a Peace Officer."  The Senior Hearing Officer upheld the RVR despite Ms. Crowder's legitimate safety concerns, which were noted in the original RVR.

36.     Worse, in October 2015, approximately a month after the sexual assault, Ms. Crowder was

FIRST AMENDED COMPLAINT                                                          8

placed in solitary confinement – also referred to as administrative segregation – for a total of approximately nine months.

37.     Ms. Crowder was first placed in solitary confinement on October 10, 2015 due to an RVR issued by Correctional Officer S. Davis, one of the officers to whom Ms. Crowder reported her sexual assault and who refused to take action.  When she was released to the Sensitive Needs Yard in December 2015, Ms. Crowder was placed on the same yard as her rapist.  When she expressed safety concerns, she was immediately placed back in solitary confinement.   The documented reason for the solitary confinement placement was that Ms. Crowder posed "an immediate threat to the safety of self or others."

38.     She was released from solitary confinement again on January 10, 2016 and placed back in solitary confinement the next day because an anonymous prisoner alleged that she was manufacturing a weapon.  No weapon was ever found.  Ms. Crowder again remained in solitary confinement for 2.5 months until March 30, 2016.

39.     On April 4, 2016, five days after being released, Ms. Crowder was again placed in solitary confinement.  The reason for this placement: "'Confidential Information' was received that you have been targeted for assault due to your known sexual behaviors inside dorm/living areas inside the housing unit.  Due to the reception of this information you are deemed a threat to the safety and security of the institution, staff and inmate population(s)."  Ms. Crowder remained in solitary confinement for an additional 3.5 months until July 17, 2016.

40.     Ms. Crowder was then transferred between multiple facilities until mid-September 2016, including California Health Care Facility, California State Prison Corcoran, and back to NKSP.  Ms. Crowder should never have been transferred back to NKSP, where she was beaten by correctional staff, especially in light of the federal pro se complaint she filed about the beating on June 20, 2016.  When Ms. Crowder arrived at NKSP on September 13, 2016, she was threatened by Officer Ibarra, one of the defendants in her lawsuit.

C.     **Defendants Santos and Does 1-3 Failed to Protect Plaintiff from Her Former Abuser**

41.     On September 15, 2016, Ms. Crowder was transferred to CMF.

42.     On September 17, 2016, Ms. Crowder's former boyfriend, who was also incarcerated at CMF, threatened, while he and Ms. Crowder were in the gym, to kill Ms. Crowder if she did not leave her

wife.  The prisoner who threatened Ms. Crowder has a history of violence within the prison.  Ms. Crowder left the gym and immediately reported the threat, specifying he was her abusive ex-boyfriend, to Defendant Santos, who was standing near the control room outside the gym.  Although Ms. Crowder expressed legitimate safety concerns, Defendant Santos was dismissive and refused to take her safety concerns seriously in compliance with PREA.  Instead, Defendant Santos told Ms. Crowder that he would document the threat, but that there was nothing else he could do because no violent action had been taken against her.  Upon information and belief, Defendant Santos never documented the threat.

43.     Two days later, on September 19, 2016, Ms. Crowder was brutally assaulted by this ex-boyfriend in Dining Hall #2.  Specifically, Ms. Crowder's ex-boyfriend assaulted her with a box cutter while she was sitting at a table.  As this was happening, a Correctional Officer who was standing approximately 35 yards away – henceforth referred to as Doe 1 – witnessed the assault and did nothing to stop it.  Doe 1 stood and watched Ms. Crowder be violently sliced on the head, face, neck, ear, and hands.  Ms. Crowder noticed two other Correctional Officers in the dining hall during the incident, henceforth referred to as Doe 2 and Doe 3.  Doe 2 and Doe 3 were standing near the food, which was approximately 70 yards from the assault.  They also did nothing to stop the assault.  In light of Does 1-3's failure to intervene, Ms. Crowder ran towards Doe 1 in hopes of receiving protection from her attacker.  In response, Doe 1 shoved Ms. Crowder – who was noticeably bleeding from her face, head, neck, ear, and hands – against the wall and forced her into handcuffs, as if she was the attacker.

44.     Ms. Crowder was escorted out of the dining hall in handcuffs, while bleeding profusely and with her ear hanging partially from her head, into the nearby hallway where Defendant Santos – the Sergeant who refused to address Ms. Crowder's safety concerns related to her attacker two days prior – and approximately 15 Correctional Officers were standing.  Upon information and belief, Defendant Santos and these Correctional Officers heard the assault from the hallway but did not enter the dining hall.

**D.     Defendants Hopper and Hadrava Discriminatorily Blamed Plaintiff for Being Assaulted Because She is Transgender**

45.     Ms. Crowder was eventually escorted to CMF's emergency room.  In the emergency room, nurses rushed to mitigate Ms. Crowder's blood loss and attend to her injuries.  Rather than focus on Ms. Crowder's immediate medical concerns, correctional staff and CMF's Investigative Services Unit ("ISU")

insisted on questioning Ms. Crowder about the incident while approximately 3-4 nurses held gauzes to her bleeding wounds.  According to Defendant Hadrava, the Lieutenant in charge of the dining halls, the questioning could not wait because Dining Hall #2 was shut down due to the assault and they needed to get the investigation "over with" to get back to business as usual.  Such a statement implied that Ms. Crowder's assault and her need for medical attention was a burden instead of a trauma.

46.     Ms. Crowder was questioned by several employees, including Defendant Hadrava and Defendant Hopper, an ISU Lieutenant.  These employees' line of questioning implied that Ms. Crowder's gender, specifically her transgender "lifestyle" and femininity, caused and warranted the assault.  Ms. Crowder was asked questions along the lines of, "What did you do to him to deserve this?" and, "Did you try to flirt with him?"  Defendant Hopper particularly blamed Ms. Crowder for the assault.  He insinuated that Ms. Crowder instigated the assault by making her ex-boyfriend jealous when she sat with another prisoner.  According to Defendant Hopper, in doing so, Ms. Crowder "flaunted" her decision to not be in a relationship with her attacker.  Defendant Hopper also commented that Ms. Crowder made herself a target by "choosing" to present as a woman and live openly as a transgender woman.

47.     Throughout this interrogation, the correctional staff stood in the way of the emergency room's nursing staff as they tried to attend to Ms. Crowder's open wounds.  The nursing staff requested that the correctional staff move out of the way several times.  In response, the nurses were told that they needed to work around the correctional staff and ISU employees.  Ms. Crowder was questioned the entire time she was in the emergency room, even when she was being escorted to an ambulance.

48.     Ms. Crowder was then transported to Northbay Vaca Valley Hospital, where she received 63 stitches on her face, head, neck, ear, and hand areas, as well as 14 staples on her head.

49.     As a result of Defendant Santos's and Defendants Does 1-3's failure to protect Ms. Crowder, Ms. Crowder suffered severe bodily harm.  Following the assault, Ms. Crowder has suffered 60% loss of hearing in her right ear and severe chronic lower back pain.  Ms. Crowder's back pain limits her ability to walk, stand for long periods of time, and move up and down.  As such, the back pain also limits her options for work assignments. Ms. Crowder has also developed keloids in the areas where the

stitches and staples were placed and removed from her head, neck and ear.[7]  The keloids cause constant, stabbing pain and have worsened over time.  They have also permanently deformed most of the right side of Ms. Crowder's face, head, and neck.  Ms. Crowder has been denied pain medication to treat the pain she suffers from these injuries, as well as surgery to remove the keloids and/or limit their size to mitigate the damage their growth is causing to her hearing and the shape of her right ear.

50.     When Ms. Crowder returned to CMF, Defendant Santos and Defendant Hadrava placed her in solitary confinement for eight days despite her objections.  Defendant Santos then documented that she refused to participate in her Administrative Segregation Unit Placement Notice and conducted it without her present, indicating she was being placed in solitary confinement "[p]ending conclusion of investigation into enemy safety concerns."  During this critical time for her physical and mental health following the assault, Ms. Crowder was trapped in a filthy cell without access to cleaning materials or showers and was isolated from her support network within the prison.  Due to the stress and trauma of the attack and solitary confinement, she suffered multiple seizures in isolation with no cellmate to call for help.  She was only allowed to leave her cell to have her stitches cleaned.  It is also important to note that correctional staff have a heightened presence and increased power in solitary confinement, a factor that caused Ms. Crowder additional pain and suffering in light of correctional staff's role in the assault and mistreatment at the emergency room.

51.     The Administrative Segregation Unit Placement Notice was updated on September 27, 2017 and signed by Captain Brown indicating the "investigation concluded no enemy concerns & no offense."  Ms. Crowder should have, but was never afforded a review by the Institutional Classification Committee to determine her placement and release from administrative segregation.  Per the Department of Operations Manual ("DOM") § 52080.24:

> Pending a classification committee determination of the inmate's housing assignment, which may include assignment to one of the segregation program units or to the inmate general population, an inmate may be placed in a designated temporary housing unit. An inmate's placement in temporary segregation shall be reviewed by the Institutional

---

[7] A keloid is a "type of raised scar" that "grow[s] much larger than the wound that caused the scar." American Academy of Dermatology, *Keloids*, www.aad.org/public/diseases/bumps-and-growths/keloids. Plaintiff's keloids are currently raised approximately one to three inches.

Classification Committee (ICC) within ten days of receipt in the unit. Action shall be taken to retain the inmate in temporary segregation or release to general population.

52.     Following solitary confinement, Ms. Crowder was transferred to the unit where her attacker lived prior to the assault.  This unit housed several of her attacker's friends, who blamed Ms. Crowder for instigating the assault.  Indeed, Ms. Crowder's new cellmate was a friend of her attacker.  Ms. Crowder immediately complained to correctional staff.  She remained in the unit until the next day.

53.     Since the attack, Ms. Crowder not only has suffered extreme pain and suffering from the physical injuries she incurred, she has been diagnosed with Post-Traumatic Stress Disorder ("PTSD"). Her symptoms include, extremely low appetite, problems sleeping and nightmares, mood swings and panic attacks.

**E.     The Homophobic and Transphobic Culture Among CMF Correctional Staff Contributed to Defendants' Failure to Protect Plaintiff**

54.     Defendant Hopper's and Defendant Hadrava's discriminatory comments to Ms. Crowder during their interrogation in the CMF emergency room reflect a broader homophobic and transphobic disposition among CMF correctional staff.  CMF correctional staff have subjected Ms. Crowder and other LGBTQI prisoners to anti-LGBTQI comments and harassment, provided no means of recourse or accountability for such discrimination and harassment by staff, and subjected her to retaliation for filing grievances and complaints.

55.     CMF correctional staff routinely express disgust with LGBTQI prisoners, referring to their "lifestyles" as optional.  They actively refuse to use gender-affirming pronouns for transgender prisoners – a discriminatory act commonly referred to as misgendering.  Rather, LGBTQI prisoners are called "faggots" and "abominations."   When LGBTQI prisoners report these homophobic and transphobic comments, their requests for non-discrimination and human decency are perceived as burdensome or as a request for a "favor" or "special treatment."  Such complaints and grievances also often result in retaliation from correctional staff in the form of minor, frivolous, and/or false RVRs.[8]

---

[8] Staff complaints and grievances are reviewed and decided by Defendant Fox and Defendant Tileston. As the Hiring Authority, Defendant Fox has the authority to discipline staff for discriminatory or harassing conduct.  Defendant Fox and Defendant Tileston were also aware of and condoned many of the frivolous and/or false RVRs that correctional staff issued to Plaintiff because of Defendant Tileston's role as Chief Disciplinary Officer in the disciplinary hearing process and because of her written grievances related to the RVRs.

56.     Ms. Crowder has been misgendered and/or called a "faggot" by at least 15 Correctional Officers, Sergeants, and Lieutenants at CMF.   She is also frequently misgendered to her face and throughout her central and medical files.

57.     CMF correctional staff also routinely harass transgender prisoners.   This is particularly harmful given correctional staff's power over prisoners' day-to-day activities.   CMF correctional staff can interfere with prisoners' access to bathrooms, showers, meals, medical appointments, work assignments, classes, and programming, among other things.   They also have the power to search and discipline prisoners.

58.     In Ms. Crowder's experience, CMF correctional staff have searched and disciplined Ms. Crowder for wearing gender-affirming make-up and have blocked Ms. Crowder from using water fountains, showering, going to the canteen, and attending pill calls, meals, and physical therapy appointments.   Correctional staff have also refused to provide transgender prisoners with private bathroom and shower access, intentionally creating dangerous situations for transgender prisoners.

59.     Correctional staff similarly target transgender prisoners with public strip searches that aim to humiliate, objectify, and degrade transgender prisoners.   These strip searches are often performed by male employees despite requests for a female officer to conduct the search.   Ms. Crowder was publicly strip-searched by a male correctional officer – Defendant Gibbs – in front of five male prisoners in September 2017.   She had requested to be searched by female officer.   Ms. Crowder is aware of at least four other transgender prisoners who have been subjected to public strip searches at CMF.

60.     Ms. Crowder has also been denied equal access to college courses and work assignments due to her sexual orientation, gender identity, and gender expression.   In June 2017, a canteen manager told Ms. Crowder that he would not hire her because she was transgender and a "faggot."   Similarly, when Ms. Crowder showed up to her first day at a new work assignment in the library in September 2017, Defendant Fabienne Farmer, the head of CMF's library program, had Ms. Crowder reassigned.   Defendant Farmer's explanation to Ms. Crowder was, "I am not hiring any transgenders."   More recently, in August 2018, Defendant Farmer, who also is the Principal of CMF's school program, blocked a teacher from hiring Ms. Crowder as a teacher's assistant.   Around the same time, Defendant Farmer also removed Ms. Crowder from a community college course taught by a Solano College professor because, according to

Defendant Farmer, Ms. Crowder's gender expression was "not a good look" for CMF.  Upon information and belief, Ms. Crowder was the only transgender student in CMF's college course program.

61.    CMF's correctional staff's hostile attitudes towards LGBTQI prisoners begins at the top with Warden Robert Fox and percolates down.  For instance, upon information and belief, Defendant Fox overruled Ms. Crowder's primary clinician, primary care physician, and CMF's Chief Medical Officer's unanimous medical opinion that a wig was medically necessary to treat Ms. Crowder's gender dysphoria. Defendant Fox, who is not a medical provider and does not have a medical license, indicated that he did not agree that the wig was medically necessary and refused to allow access.

F.    **CMF Correctional Staff Searched and Disciplined Plaintiff in Retaliation for her Grievances and Lawsuit**

62.    Following the September 2016 assault, Ms. Crowder filed written grievances and eventually filed this lawsuit on August 7, 2017.  In response, CMF's correctional staff has subjected Ms. Crowder to increased searches, false RVRs, and disciplinary actions.

63.    On September 23, 2016, a few days after the assault, Ms. Crowder filed a written grievance about Does 1-3's misconduct during the September 19, 2016 assault.  Within eight weeks of this grievance, Ms. Crowder was searched, received a verbal warning, and was issued three RVRs by correctional staff.

64.    Ms. Crowder filed another written grievance about correctional staff misconduct on December 31, 2016.  Six weeks later, on February 12, 2017, Ms. Crowder was subjected to another search and RVR.

65.    Ms. Crowder filed her next written grievance about correctional staff misconduct on June 29, 2017.  Three weeks later, on July 17, 2017, she was searched yet again and received another RVR.

66.    On August 4, 2017, Ms. Crowder was issued a disciplinary General Chrono.  The Chrono's author, Defendant Lieutenant Cherniss, inappropriately concluded, "It is my recommendation that CROWDER be unassigned and placed in Work Group / Privilege Group A2/B until such time as she is transferred to a Level IV institution."  It did not make sense to indicate that Ms. Crowder was transferring to a Level IV institution given that Ms. Crowder's classification score remained well within the point levels for a Level III institution at the time.  Indeed, Ms. Crowder's score was on track to decrease due to her work assignment and school participation.  Such a recommendation suggests that correctional staff

1    members were issuing RVRs and Chronos with the goal of increasing Ms. Crowder's classification score,

2    and therefore her classification level, to force a transfer.  As a result of this chrono, Ms. Crowder was

3    terminated from her work assignment and could not secure another work assignment until September 23,

4    2017. (CMF eventually acknowledged that this chrono included false information on October 3, 2017 and

5    removed it from Ms. Crowder's file on November 22, 2017).

6           67.    A week later, and only a few days after Ms. Crowder filed this lawsuit, Ms. Crowder

7    received an additional RVR on August 11, 2017.  When Ms. Crowder learned Defendant Cherniss would

8    be the Senior Hearing Officer for this RVR's disciplinary hearing, she requested a different hearing officer

9    due to the conflict of interest arising from Defendant Cherniss's recent, falsified Chrono.   Defendant

10   Cherniss then issued Ms. Crowder another disciplinary Chrono on August 21, 2017, falsely claiming that

11   Ms. Crowder refused to attend the RVR hearing held by Defendant Cherniss, whereby he found her guilty

12   of the August 11, 2017 RVR.  As a result, Ms. Crowder was reassigned to Privilege Group "C" – also

13   known as C-status – from August 21, 2017 through November 19, 2017.  Prisoners on C-status are not

14   allowed family visits, packages, non-emergency phone calls, recreational or entertainment activities,

15   entertainment appliances, or hobby materials.  They are also subjected to limited canteen purchases, yard-

16   access, religious programming, movement, and reading materials.

17          68.    Undeterred, Ms. Crowder continued to file at least four additional written grievances

18   between September 2017 and January 2018.   One of these grievances included a complaint about

19   Correctional Officer Gibbs subjecting transgender prisoners, including Ms. Crowder, to discriminatory,

20   humiliating public strip searches in front of other prisoners.  In response to this grievance, Defendant

21   Gibbs retaliated against Ms. Crowder by searching and damaging her walker on March 6, 2018.  Defendant

22   Gibbs laughed and stated that this was "the beginning of the payback" and that he would make her time

23   at CMF "hell" if she continued to file grievances about him.  Mr. Gibbs also made several transphobic

24   and homophonic comments including that: transgender women at CMF need to "realize they are men;"

25   transgender prisoners should not get "special treatment;" "being a faggot is an abomination;" and that he

26   would always refer to CMF prisoners as men no matter what he is instructed to do.  Mr. Gibbs also noted

27   that he wished he was assigned to the dining hall when Ms. Crowder was assaulted on September 19, 2016

28   because she deserved it for being a "faggot."

FIRST AMENDED COMPLAINT                                                              16

69.     Ms. Crowder filed an additional two grievances in March and May 2018.  She also began to meet with her attorneys in January, March, and June 2018.  In response, Ms. Crowder was issued three RVRs and a disciplinary Chrono between June 25, 2018 and August 1, 2018.  She was also removed from her work assignment on July 28, 2018 and from one of her college courses on August 17, 2018.

70.     The June 25, 2018 disciplinary Chrono was authored by CMF's Litigation Coordinator, Defendant Brandy Ebert.  It stated that Ms. Crowder had become "disruptive" when she requested her legal visit be moved to a confidential setting.  The location of the legal visit was in a room in the sally port with a 1x2 foot rectangular hole in the door.  Ms. Crowder and her legal advocates had calmly requested a more private room given Ms. Crowder's difficulty hearing due to her injuries and the nature of the legal visit.  Defendant Ebert refused to accommodate their requests and instead issued a 128-B Chrono to Ms. Crowder.

71.     On the following legal visit, Defendant Ebert stood in the sally port outside the door with the 1x2 foot rectangular hole listening to the content of Ms. Crowder and her legal team's confidential communications.  As a result, Ms. Crowder and her legal team terminated their meeting early.  Ms. Crowder's legal team were then escorted out of the prison by Defendant Ebert.  During the escort, Defendant Ebert pulled Ms. Crowder's legal team into a small corridor and accused them of disrupting prison operations.  She then threatened to place Ms. Crowder's attorney on a restricted list.  When Ms. Crowder's attorney informed Defendant Ebert they had not caused a disruption and that they had unresolved concerns about the location of their privileged meetings, she stated, "I only take orders from and report to the Warden."

**G.     Defendants Fox and Tileston Transferred Plaintiff in Retaliation for her Lawsuit and Continued Grievances and in Violation of PREA Standards Specifically Related to Transgender Prisoners**

72.     Ms. Crowder's classification score has increased due to the retaliatory RVRs and removal from school and work assignments.  Correctional staff continued to solicit and fabricate RVRs against Ms. Crowder until her classification score reached Level IV to justify a transfer out of CMF.  Such a transfer would retaliatorily put an end to Ms. Crowder's continued grievances against CMF correctional

staff, separate Ms. Crowder from her wife,[9] and place Ms. Crowder – a transgender woman of color who is particularly vulnerable in prison – in a more dangerous Level IV prison.

73.     Furthermore, on July 6, 2017, Ms. Crowder became eligible for the nonviolent Parole Review Process as a result of Proposition 57.  She was eligible for possible release on July 5, 2018, however, the retaliatory and fabricated RVRs provided a basis for her denial of parole.  On May 31, 2018, Ms. Crowder was informed by the Division of Adult Institutions that she would not be referred to the Board of Parole Hearings for parole review and possible early release because she had "been found guilty of two or more **serious** Rules Violations Reports (RVRs) in the past year."  (emphasis added).  None of the RVRs Ms. Crowder received the year prior involved violent behavior or acts that should have risen to a Serious Rules Violation as defined under 15 CCR § 3315.

74.     After six retaliatory RVRs, Ms. Crowder became eligible for reclassification to Level IV in August 2017.  Upon information and belief, at that time, Defendant Associate Warden Christopher Tileston, under the direction of Defendant Fox, began pressuring Ms. Crowder's Correctional Counselor, M. Vaden, to refer Ms. Crowder to CMF's Unit Classification Committee ("UCC").  Upon information and belief, Defendant Tileston routinely emailed Ms. Vaden about recommending Ms. Crowder's transfer to the UCC – sometimes as often as weekly – between the fall of 2017 and August 2018.  Indeed, in Ms. Vaden's September 2017 Transgender Biannual Assessment, Ms. Vaden noted that Ms. Crowder was "eligible for a higher custody consideration due to two (2) serious CDC/RVR's and has been referred to UCC for Level IV placement consideration if applicable," but that there was "[n]o action required because" Ms. Crowder does "not have any safety concerns at CMF at this time."

75.     On August 30, 2018, CMF's UCC recommended that Ms. Crowder be transferred to Kern Valley State Prison ("KVSP") or Salinas Valley State Prison ("SVSP").  This recommendation was made despite Ms. Vaden's objections.  The UCC also placed Ms. Crowder into Restricted-Cocci status while she awaited the transfer.  Due to this status, Ms. Crowder lost her work, phone, packages, dayroom, and entertainment appliances privileges.

---

[9] Ms. Crowder was housed with her wife from November 2016 through October 2018.  While housed with her wife, Ms. Crowder suffered no physical or sexual assaults by correctional staff or other prisoners and had minimal safety concerns.  Correctional staff attempted to dissuade her from continuing to file and pursue her grievances by threatening to transfer her away from her wife, where she was safer.

76.     Ms. Crowder was transferred to Sacramento State Prison ("CSP-SAC") on October 8, 2018.  On that day, Defendant Fox approached Ms. Crowder and expressed excitement over her transfer.  He also told Ms. Crowder that there was a surprise waiting for her at CSP-SAC.

77.     When Ms. Crowder arrived at CSP-SAC, she was placed on the same yard (C-yard) as the ex-boyfriend who attacked her in September 2016.  This should have never been permitted given that Ms. Crowder's attacker is identified as one of her non-confidential enemies.  According to Correctional Counselor I Davis, Ms. Crowder's placement with her non-confidential enemy could have only been assigned at the Associate Warden or Warden-level.  Ms. Crowder remained on the same yard as her attacker locked in an orientation cell for four days.

78.     On October 12, 2018, Ms. Crowder attended an emergency Institutional Classification Committee ("ICC") and UCC meeting.  The ICC and UCC temporarily placed Ms. Crowder in CSP-SAC's Short Term Restricted Housing ("STRH") unit[10] while they scheduled a second ICC and UCC meeting in which CSP-SAC's Warden could attend.  Ms. Crowder met with the ICC, UCC, and the Warden on October 18, 2018.  During this meeting, Ms. Crowder begged for a transfer back to CMF where she felt safest.  The ICC, UCC, and Warden ignored this request – in violation of PREA – and put Ms. Crowder up for transfer to SVSP or KVSP.  Both prisons are notorious for violence against transgender prisoners in the general population, resulting in solitary confinement or Sensitive Needs Yards as the only housing options.

79.     While waiting for a transfer, Ms. Crowder lost approximately 18 pounds due to the distress caused by the transfer to her attacker's prison.  Furthermore, her other PTSD-associated symptoms were significantly exacerbated, including panic attacks and nightmares.

80.     On October 30, 2018, Ms. Crowder was finally transferred out of CSP-SAC.  She arrived at KVSP on October 31, 2018, where she continues to be housed.  On November 1, 2018, a group of six transphobic prisoners immediately threatened to kill Ms. Crowder if she did not leave KVSP's general

---

[10] STRH is a form of solitary confinement for prisoners at the Correctional Clinical Case Management System level of care.

FIRST AMENDED COMPLAINT

population.[11]

81.     On November 8, 2018, the ICC and UCC proposed transferring Ms. Crowder to another general population yard.  Ms. Crowder explained that KVSP's general population yards were not safe for transgender prisoners.  She reiterated that she felt safest at CMF and requested a transfer back.  The ICC and UCC denied this request.  Ultimately, it was decided to transfer Ms. Crowder to the Sensitive Needs Yard.  Due to this reclassification, Ms. Crowder is not eligible to return to CMF.  Ms. Crowder also has less access to programming and work assignments as a Sensitive Needs Yard prisoner.

82.     Due to her transfers, Ms. Crowder has been completely cut off from her main source of support – her wife – as prisoners are not allowed to write to each other without approval.  Ms. Crowder has not heard back on her request to correspond with her wife.  Upon information and belief, Defendant Fox would have to approve the request. Ms. Crowder has also gone without her personal property and, as a result of the transfers, Ms. Crowder has not been allowed to work or attend school since August 2018.

83.     Ms. Crowder's continuity of medical care has also been disrupted by the retaliatory transfers.  Prior to the transfers, Ms. Crowder received two consultations and was referred for keloid surgery while at CMF.  She was recently informed by her KVSP primary care physician that she would no longer receive keloid surgery now that she is no longer housed at CMF.  Similarly, Ms. Crowder no longer receives treatment for her anal fissures that resulted from the September 2015 rape at the California Substance Abuse Treatment Facility.  She also no longer has access to her walker, cane, and wrist brace.

**H.     Plaintiff is Treated Differently Than Cisgender Prisoners Based on CDCR's, Defendant Diaz's, and Defendant Fox's Failure to Implement LGBTQI-Specific PREA Standards**

84.     LGBTQI prisoners are particularly vulnerable to sexual violence.  Although the PREA Standards apply to state prisons, existing California laws, policies, and procedures do not incorporate the PREA Standards that specifically address the safety of LGBTQI prisoners.

85.     Specifically, despite significant revisions and multiple amendments to the DOM to

---

[11] Due to gang or prison politics, at most prisons, including KVSP, transgender prisoners are frequently forced off the mainline by gang-affiliated prisoners.  Because CMF is also a hospital, gang or prison politics are typically set aside and transgender prisoners are allowed by gang-affiliated prisoners to walk the mainline with less fear of being attacked.  Gang or prison politics also do not typically govern transgender prisoners on Sensitive Needs Yards; however, with the emergence of prison gangs on Sensitive Needs Yards, these yards are also not safe for transgender prisoners.

incorporate the PREA Standards in 2018, CDCR regulations, policies, and procedures still do not comply with LGBTQI-specific PREA Standards related to housing and screening.

86.    However, other vulnerable population screening criteria have been adopted in California under Penal Code Section § 2636, including the age of the prisoner and whether they have a mental illness.

87.    Completely absent from the screening process are the PREA Standards' specific considerations that disproportionately affect LGBTQI prisoners, as set forth in 28 C.F.R. 115.41(d), including the considerations of: whether the prisoner is lesbian, gay, bisexual, transgender, or intersex; whether the prisoner has previously experienced a sexual assault; the prisoner's own perception of vulnerability; whether the prisoner has been a victim of sexual abuse or had perpetrated sexual abuse that did not occur in a prison setting; or whether the prisoner has prior convictions for sex offenses against an adult or child.

88.    Indeed, the 2017 Federal PREA Audit Report of CMF states:

> A review of the intake screener showed it does not contain all criteria required by subsection (d) of this standard. The initial screener does not take into account whether the offender has prior convictions for sex offenses against an adult or child; whether the offender is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming; the offenders own perception of vulnerability, or whether the offender has been a victim of sexual abuse or had perpetrated sexual abuse that did not occur in a prison setting. In addition, the screener is not objective and does not allow for consistency in classification of all offenders. Risk of victimization or abusiveness for offenders housing placement is at the discretion of the individual conducting the assessment."[12]

89.    PREA further requires CDCR to consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety and whether the placement would present management or security problems when deciding whether to assign a transgender or intersex inmate to a facility for male or female prisoners and in making other housing and programming assignments. 28 C.F.R. § 115.242(c). Such an assessment was done once for Ms. Crowder by Correctional Counselor Vaden, as detailed above. Ms. Vaden's Transgender Biannual Assessment recommended that Plaintiff remain in her current housing placement. This recommendation was rejected.

---

[12] *PREA Audit: Auditor's Summary Report, Adult Prisons and Jails*, 16, (January 12, 2018), www.cdcr.ca.gov/PREA/docs/CMF-2017-PREA-Report.pdf.

90.     28 C.F.R. § 115.242(e) states, "A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration."  This criterion is also absent from the current statutory and regulatory schemes governing CDCR.  Indeed, the 2017 Federal PREA Audit Report of CMF states that "'[a] policy must give 'serious consideration' to transgender or intersex inmates own views with respect to safety.' DOM 62080.14 does not show the facility must consider the offender's own views of their safety before placing the offender in an institution . . . "[13]

91.     The current DOM also does not address access to programming for prisoners placed in solitary confinement for their own safety.  However, PREA clearly requires that such opportunities be provided under 28 C.F.R. § 115.43(a): "Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers. If a facility cannot conduct such an assessment immediately, the facility may hold the inmate in involuntary segregated housing for less than 24 hours while completing the assessment."  Furthermore, "[i]nmates placed in segregated housing for this purpose shall have access to programs, privileges, education, and work opportunities to the extent possible."  *Id*. at § 115.43(b).  If the facility must restrict programs privileges and work activities, they are required to document the limited opportunities, reasons for those limitations, and duration of the limitation.  An assignment to involuntary solitary confinement is not to exceed 30 days. *Id*. at § 115.43(c).

92.     Although CDCR's DOM does indicate reassessments will occur in the timeframe stated above, there is no mention of access to programming and other opportunities to be provided, or required documentation to be completed if they are not provided.  On the multiple occasions Ms. Crowder has been placed in solitary confinement due to safety concerns, she has been denied privileges and access to work and education programming.  Such restrictions have prevented her from earning credits that could have kept her in safe housing with her wife and allowed for earlier release.

93.     In 2016, CDCR Secretary Scott Kernan reported to the U.S. Attorney General on behalf of CDCR that California was not compliant with PREA, certifying that California would be compliant by

---

[13] *PREA Audit: Auditor's Summary Report, Adult Prisons and Jails*, 17, (January 12, 2018), www.cdcr.ca.gov/PREA/docs/CMF-2017-PREA-Report.pdf.

the completion of the next three-year auditing cycle, which would be 2019.  Furthermore, Governor Jerry Brown gave assurances to the U.S. Department of Justice that five percent of yearly federal funding would be allocated to bring California in compliance with PREA.

94.   CDCR's disparate treatment of transgender, queer, and intersex prisoners extends to the gender-specific PREA policies it has already implemented.  For instance, CDCR's PREA policy in the 2018 DOM states, "Each institution shall enable offenders to shower, perform bodily functions, and change clothing without non-medical staff of the *opposite biological sex* viewing their breast, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." (emphasis added).  The federal PREA standard is almost identical except for a few very important words: CDCR replaced *gender* with *biological sex*.  The federal PREA policy states that each facility shall "enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the *opposite gender* viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks.  Such policies and procedures shall require staff of the *opposite gender* to announce their presence when entering an inmate housing unit."  28 C.F.R. § 115.15(d) (emphasis added).

95.   To ensure there is no confusion among transgender prisoners regarding the policy, CDCR's 2018 DOM specifies that male staff are permitted by CDCR policy to be present while transgender women are exposed.   It states, "This policy shall be included in each institution's orientation handbook. This will allow the inmate to take into consideration that staff of the *opposite gender* may be present when performing bodily and bathing functions."

96.   In addition to housing transgender women in men's institutions, CDCR has limited available housing for transgender women.  Out of the 30+ CDCR facilities designated for men, only nine are designated for transgender women.

97.   The U.S. Department of Justice's 2017 PREA audit points out this violation, highlighting that the DOM "specifically shows male to female transgendered offenders will be housed in male facilities and female to male offenders will be housed in female facilities. The PREA Resource Center's 'FAQ' states, 'A written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates the

standard.'"[14]

98.     Furthermore, limiting transgender women's housing limits the options for them to be safely housed and fully participate in programming.   Most of the facilities listed do not allow transgender prisoners to safely program and house in the general population, relegating transgender prisoners to Sensitive Needs Yards where they have limited access to education, work, and other programming opportunities, which disproportionately impacts transgender prisoners by preventing them from receiving work and education credits. Therefore Ms. Crowder and other transgender prisoners are subjected to longer prison sentences solely based on their gender identity and expression.

## V.     CAUSES OF ACTION

### COUNT I

**Failure to Protect**
**Eighth Amendment, 42 U.S.C. § 1983**
**(Against Defendants Santos and Does 1-3)**

99.     Plaintiff repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

100.     Defendant Santos and Defendants Does 1-3 – acting in their individual capacities and under the color of state law – were deliberately indifferent to Plaintiff's serious safety concerns when she was transferred to CMF in September 2016.

101.     Defendant Santos knew of the threat made by Plaintiff's historically violent ex-boyfriend, disregarded Plaintiff's serious safety concern, and failed to take any reasonable measures to address Plaintiff's serious safety concern, resulting in severe bodily harm to Plaintiff.   Upon information and belief, Defendant Santos also heard Plaintiff being assaulted and failed to take any reasonable measures to intervene and stop the assault, resulting in severe bodily harm to Plaintiff.

102.     Defendants Does 1-3 witnessed Plaintiff being assaulted and failed to take any reasonable measures to intervene and stop the assault, resulting in severe bodily harm to Plaintiff.

103.     By failing to protect Plaintiff from her ex-boyfriend who threatened her, Defendant Santos and Defendants Does 1-3 have deprived Plaintiff of her right to be free from cruel and unusual punishment

---

[14] *PREA Audit: Auditor's Summary Report, Adult Prisons and Jails*, 19, (January 12, 2018), www.cdcr.ca.gov/PREA/docs/CMF-2017-PREA-Report.pdf.

guaranteed by the Eighth Amendment to the United States Constitution.

104.    As a direct and legal result of Defendant Santos's and Defendants Does 1-3's actions and/or omissions and/or in ratifying such acts or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

**COUNT II**

**Violation of Equal Protection Based on Gender or Transgender Status**
**Fourteenth Amendment, 42 U.S.C. § 1983**
**(Against Defendants Diaz, Fox, Tileston, Hopper, Hadrava, Santos, Gibbs, Farmer, and Does 1-3, collectively "the Count II Defendants")**

105.    Plaintiff repeats and re-alleges the allegations of all the proceeding paragraphs as if fully set forth herein.

106.    The Count II Defendants – acting in their own individual and official capacities and under the color of state law – discriminated against Plaintiff because of her sex and/or because she is transgender in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

107.    Under the Equal Protection Clause, discrimination based on sex, including discrimination based on gender nonconformity, is presumptively unconstitutional and subject to heightened scrutiny. Discrimination based on transgender status is also, separately, presumptively unconstitutional and subject to heightened scrutiny.

108.    Defendant Diaz, acting in his official capacity, failed to ensure CDCR's compliance with PREA's standards and directives related to LGBTQI prisoners, while implementing portions of PREA for non-LGBTQI prisoners.  Defendant Diaz thus treated Plaintiff differently based on her sex and her perceived non-conformity with sex stereotypes.

109.    Despite Plaintiff's written grievances, Defendant Fox and Defendant Tileston failed to protect Plaintiff from discrimination, harassment, and threats from CMF correctional staff.  Defendant Fox and Defendant Tileston also failed to consider Plaintiff's PREA-compliant Transgender Biannual Assessment or consider her perception of safety when determining housing placement – in violation of PREA – based on the fact that she is transgender and/or because of sex-based stereotyping.  Defendant

Fox and Defendant Tileston thus treated Plaintiff differently based on her sex and her perceived non-conformity with sex stereotypes.

110.     Defendant Hopper and Defendant Hadrava discriminated against and harassed Plaintiff by blaming the September 2016 assault on Plaintiff's gender expression, sexual orientation, and transgender identity.   In doing so, Defendant Hopper and Defendant Hadrava discriminated against and harassed Plaintiff because she is transgender and/or because of their sex-based stereotyping about the ways in which Plaintiff should appear, act, and express herself based on her sex assigned at birth.   Defendant Hopper and Defendant Hadrava thus treated Plaintiff differently based on her sex and her perceived non-conformity with sex stereotypes.

111.     Defendant Santos failed to protect Plaintiff from a legitimate threat and failed to stop the September 2016 assault because Plaintiff is transgender and/or based on the sex-based belief that people who are assigned the male sex at birth should display only stereotypically male characteristics, behaviors, or dress.   Defendants Does 1-3 failed to stop the September 2016 assault because Plaintiff is transgender and/or based on the sex-based belief that people who are assigned the male sex at birth should display only stereotypically male characteristics, behaviors, or dress.   Defendant Santos and Defendants Does 1-3 thus treated Plaintiff differently based on her sex and her perceived non-conformity with sex stereotypes.

112.     Defendant Gibbs discriminated against and harassed Plaintiff based on her sex and her transgender status by misgendering her, subjecting her to transphobic and homophobic comments, performing a public strip search in violation of PREA, and failing to comply with her requests to be searched by an officer of the same gender.   Defendant Gibbs thus treated Plaintiff differently based on her sex and her perceived nonconformity with sex stereotypes.

113.     Defendant Farmer discriminated against Plaintiff by refusing to allow her job assignments in the library and as a teaching assistant because Plaintiff is transgender, and for removing Plaintiff from a community college course taught by a Solano College professor because of Plaintiff's gender expression. Defendant Farmer thus treated Plaintiff differently based on her sex and her perceived nonconformity with sex stereotypes.

114.     The Count II Defendants' discriminatory treatment of Plaintiff was motivated by her sex and her transgender status.   The Count II Defendants have intentionally discriminated against Plaintiff

because she is transgender and/or because of their sex-based belief that people who are assigned the male sex at birth should display only stereotypically male characteristics, behaviors, or dress, and so should not appear feminine or identify as women.  The Count II Defendants' intentional discrimination against Plaintiff because of sex, sex stereotyping, and/or transgender status was pursuant to official policies, procedures, customs and/or practices.

115.    The Count II Defendants' discrimination against Plaintiff because of sex, sex stereotyping, and/or gender identity is not substantially related to any important government interest, nor is it rationally related to any legitimate government interest.  The Count II Defendants' discrimination against Plaintiff because of sex, sex stereotyping, and/or gender identity is not reasonably related to legitimate penological interests, nor is it necessary for prison safety or discipline.

116.    As a direct and legal result of the Count II Defendants' actions and/or omissions and/or in ratifying such acts or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

## COUNT III

**Violation of Due Process Rights for Failing to Implement LGBTQI PREA Standards
Fourteenth Amendment, 42 U.S.C. § 1983
(Against Defendants Diaz, Fox, Hadrava, and Santos)**

117.    Plaintiff repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

118.    Defendant Diaz and Defendant Fox acting in their – official capacity and under the color of state law – have violated Plaintiff's due process rights by failing to comply with the PREA Standards, specifically as they apply to LGBTQI prisoners.

119.    Defendant Diaz's and Defendant Fox's failure to comply with the PREA Standards has resulted in an atypical and significant hardship to Plaintiff by subjecting her and other transgender prisoners to disparate processes, policies, practices, or conditions that make them more vulnerable to sexual and physical assault; disparate housing; disparate discipline; placement in solitary confinement; reduced educational and work programming; and longer sentences.

120.    By not complying with the PREA Standards, Defendant Diaz and Defendant Fox have

---

FIRST AMENDED COMPLAINT                                                                                27

created disparate processes, policies, practices, and conditions for Plaintiff and other LGBTQI prisoners that are different and less favorable than non-LGBTQI prisoners.

121.  Defendant Hadrava and Defendant Santos, in their individual and official capacities and under the color of state law – have violated Plaintiff's due process rights by placing her in solitary confinement without allowing her to participate in the review of her solitary confinement placement and failing to provide her with an ICC review of her placement in solitary confinement or classification and housing placement upon release from solitary confinement per CDCR's DOM regulations.

122.  Defendant Hadrava's and Defendant Santos's failure to comply with CDCR's DOM regulations and refusal to allow Plaintiff to participate in the review of her solitary confinement placement, or to afford her an ICC review resulted in an atypical and significant hardship to Plaintiff by subjecting her to disparate processes, policies, practices, and conditions that made her at risk for, and suffer from medical complications related to her injuries, as well as reduced her privileges, and prohibited access to educational or work programming.

123.  As a direct and legal result of Defendant Diaz's, Defendant Fox's, Defendant Hadrava's, and Defendant Santos's acts and/or omissions and/or in ratifying such acts or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

## COUNT IV

**Retaliation for Filing Grievances and a Civil Lawsuit**
**First Amendment, 42 U.S.C. § 1983**
**(Against Defendants Fox, Tileston, Cherniss, Gibbs, and Ebert, collectively "the Count IV Defendants")**

124.  Plaintiff repeats and re-alleges the allegations of all the preceding paragraphs as if fully set forth herein.

125.  The Count IV Defendants – acting in their own individual and official capacity and under the color of state law – have retaliated against Plaintiff for filing grievances and this civil lawsuit.

126.  Following her grievances and civil lawsuit, Plaintiff was searched, issued nine RVRs and two chronos, and removed from her work assignment and a college course. These adverse actions

constrained Plaintiff's ability to earn good time credits under Proposition 57 and negatively impacted Plaintiff's classification score.

127.    Upon information and belief, Defendant Fox and Defendant Tileston pressured correctional staff, to search and discipline Plaintiff in order to transfer Plaintiff from a place she felt relatively safe to another prison.  In doing so, the Count IV Defendants removed CMF's "problem" and punished Plaintiff by disrupting her housing, schooling, and work assignment and by compromising her safety, continuity of medical treatment, and access to her lawyers and her wife.

128.    By retaliating against Plaintiff for filing grievances and this civil lawsuit, the Count IV Defendants have deprived Plaintiff of her right to freedom of speech guaranteed by the First Amendment to the United States Constitution.

129.    As a direct and legal result of the Count IV Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

130.    By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count IV Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.    For injunctive relief enjoining Defendant Diaz and/or Defendant Fox to:

   i.    update, develop, and/or adopt CDCR's and CMF's policies, procedures, and practices to comply with the PREA Standards, specifically as they apply to LGBTQI prisoners;

   ii.    return Plaintiff to CMF and house her with her previous cellmate;

   iii.    provide Plaintiff with medically necessary treatment, including keloid surgery and access to a wig, walker, cane, and wrist brace;

   iv.    reinstate Plaintiff to her previous work and education assignments at CMF;

FIRST AMENDED COMPLAINT                                                                                29

v.   revoke the points added to Plaintiff's classification score and the Rules Violation Reports issued to Plaintiff in retaliation for her grievances and her lawsuit;

vi.   award points to Plaintiff's classification score in accordance with what she would have earned had she been allowed to continue her education and job assignments; and

vii.   remove any and all incorrect pronouns (e.g. male pronouns) used to reference Plaintiff in her CDCR medical and central files;

b.   For injunctive relief declaring CDCR policies and practices regarding LGBTQI housing and the non-disciplinary use of solitary confinement without consent as unconstitutional on its face and as applied to Plaintiff and other LGBTQI prisoners;

c.   For compensatory, general, and special damages, in an amount to be determined at trial;

d.   For punitive damages in an amount to be proven at trial;

e.   For reasonable attorneys' fees and costs to Plaintiff pursuant to 42 U.S.C. Section 1988; and

f.   Such other relief as the Court finds appropriate in the interest of justice.

Dated: January 7, 2019                Respectfully Submitted,

*Felicia Medina*

Felicia Medina
Jennifer Orthwein
Kevin Love Hubbard
MEDINA ORTHWEIN LLP

*Attorneys for Plaintiff Candice Crowder*