# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

TRISTAIN CROWDER, also known as
Candice Crowder,

        Plaintiff,

    v.

RALPH DIAZ, et al.,

        Defendants.

No. 2:17-CV-1657-TLN-DMC

FINDINGS AND RECOMMENDATIONS

        Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court are Defendants' motion to dismiss (ECF No. 27) and motion for misjoinder (ECF No. 28). A hearing was held before the undersigned in Redding, California, on June 26, 2019. Felicia Medina, Esq., Jen Orthwein, Esq., Kevin Love Hubbard, Esq., and Daniel H. Galindo, Esq. appeared on behalf of Plaintiff. Janet N. Chen, Esq., appeared on behalf of Defendants. After considering the parties' arguments, the matters were submitted.

/ / /

/ / /

/ / /

/ / /

1

# I. PLAINTIFF'S ALLEGATIONS

This action proceeds on Plaintiff's first amended complaint.  <u>See</u> ECF No. 17.  Plaintiff names the following as Defendants, all of whom, except Defendant Diaz, were employed at the California Medical Facility ("CMF") at the time of the alleged events: (1) Ralph Diaz, Secretary of California Department of Corrections and Rehabilitation ("CDCR"); (2) Robert W. Fox, prison warden; (3) Christopher Tileston, an associate warden; (4) Felix X. Hopper, an Investigative Services Unit lieutenant; (5) Ronald Hadrava, a lieutenant; (6) S. Cherniss, a lieutenant; (7) C. Santos, a sergeant; (8) Fabienne Farmer, the library program principal; (9) Brandy Ebert, a litigation coordinator; (10) D. Gibbs, a correctional officer and; (11) Does 1-3, correctional officers.

Plaintiff is a transgender woman who alleges systemic abuse, indifference, and discrimination at the hands of CDCR personnel.[1] The gravamen of Plaintiff's complaint arises from her time at CMF.  <u>See</u> ECF No. 17, p. 2.[2]  In September 2016, Plaintiff received death threats from her ex-boyfriend, another inmate at CMF.  <u>See id.</u> at 10-11.  Plaintiff expressed safety concerns to Defendant Santos, who took no action.  <u>See id.</u> at 11.  Two days later, Plaintiff was brutally attacked by her ex-boyfriend in the dining hall ("dining hall incident").  <u>See id.</u>  Three Doe correctional officers standing in the dining hall failed to intervene.  <u>See id.</u>  Additionally, Defendant Santos allegedly heard the attack from a nearby hallway and also failed to take action.  <u>See id.</u>  Following the attack, prison staff escorted Plaintiff to CMF's emergency room where Defendants Hadrava and Hopper investigated the incident.  <u>See id.</u>  Defendants Hadrava and Hopper indicated Plaintiff's actions, particularly her "decision" to identify as a woman, were to blame for the attack.  <u>See id.</u> at 12.  Plaintiff was treated at Northbay Vaca Valley Hospital where she received 63 stitches and 14 staples to her head.  <u>See id.</u>  When she returned to CMF, Defendants Hadrava and Santos placed Plaintiff in non-disciplinary solitary confinement for eight days, despite her objections.  <u>See id.</u> at 13.  Despite being entitled to a review by the Institutional Classification Committee to determine her placement and release

---

[1] The parties refer to Plaintiff using female pronouns in their filings, and the Court does the same.

[2] Page number references correspond to the court's electronic filing pagination.

from administrative segregation, Plaintiff received no such process.  See ECF No. 17, p. 13.

Plaintiff reported Defendants Santos, Hadrava, Hopper, and Does' conduct to no avail.  See id. at 16-18.  These grievances and Plaintiff's eventual civil suit triggered a cascade of alleged retaliatory actions, including targeted strip searches and false Rules Violation Reports ("RVRs") by Defendants Cherniss and Gibbs.  See id.  Additionally, Defendant Ebert knew of Plaintiff's civil complaint and reported her for disruptive behavior during one of Plaintiff's meetings with her attorneys.  See id. at 18.  Defendant Ebert also threatened to ban Plaintiff's attorneys.  See id.  Plaintiff alleges these actions were directed and sanctioned by Defendants Tileston and Fox to transfer her and retaliate against her for filing grievances.  See id. at 18-21.  As a result of the alleged retaliatory RVRs, prison officials increased Plaintiff's classification level, denied her a parole hearing, and transferred her to another facility where she was placed in the same yard as the ex-boyfriend who attacked her in 2016.[3]  See id. at 20.  At the time of the hearing, Plaintiff resided at another facility but has since been transferred back to CMF. See ECF No. 35.

While at CMF, Defendant Farmer refused to hire Plaintiff and removed her from educational courses because of Plaintiff's transgender status.  See ECF 17, p. 15-16.  Plaintiff alleges prison staff have misgendered transgender inmates[4] and called them "faggots" and "abominations."  See id. at 14-15.  The complaint alleges this transphobic culture starts with Defendant Fox and trickles down.  See id. at 16.  To support her claim of systemic transphobia, Plaintiff provides factual allegations of official misconduct that occurred at other CDCR prisons.  See id. at 8-10.  Finally, Plaintiff alleges many of her claims stem from Defendants Diaz, Fox, and Tileston's failure to implement housing and screening standards under the

/ / /

/ / /

/ / /

---

[3]    Plaintiff's ex-boyfriend was transferred to another prison sometime after the dining hall incident.

[4]    Plaintiff alleges CMF staff actively refused to use gender-affirming pronouns for transgender prisoners.

3

Prison Rape Elimination Act ("PREA"),[5] 32 U.S.C. § 30302, designed to protect LGBTQI[6] inmates. See ECF No. 17, p. 21-25.

From these allegations Plaintiff asserts the following four claims:

> 1.      Defendants Santos and Does 1-3 were deliberately indifferent to Plaintiff's safety by failing to take her concerns seriously and failing to intervene when an inmate brutally attacked her in the dining hall;

> 2.      Defendants Diaz, Fox, Tileston, Hopper, Hadrava, Santos, Gibbs, Farmer, and Does 1-3 violated Plaintiff's right to equal protection by discriminating against her because she is transgender;

> 3.      Defendants Diaz, Fox, Hadrava, and Santos violated Plaintiff's right to due process by failing to adopt LGBTQI standards under PREA and failing to comply with CDCR's Department Operations Manual regulations; and

> 4.      Defendants Fox, Tileston, Cherniss, Ebert, and Gibbs violated Plaintiff's First Amendment rights by retaliating against her for filing grievances and a civil suit.

## II. DISCUSSION – MOTION TO DISMISS

### A.    Applicable Legal Standard

In considering a motion to dismiss, the court must accept all allegations of material fact in the complaint as true.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007).  The court must also construe the alleged facts in the light most favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Hosp. Bldg. Co. v. Rex Hosp. Trustees, 425 U.S. 738, 740 (1976); Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994) (per curiam).  All ambiguities or doubts must also be resolved in the plaintiff's favor.  See Jenkins v. McKeithen, 395 U.S. 411,

---

[5]      Congress unanimously passed the Prison Rape Elimination Act in 2003. See 32 U.S.C. § 30302. PREA collected data on sexual assault in prison and found sexual abuse is rampant in prisons today. Transgender and gender non-conforming individuals are at an even greater risk of being victims of sexual abuse. In 2012, the U.S. Department of Justice issued PREA standards for prisons. See CFR §§ 115.41-43. These standards were later strengthened and amended in 2016. See Justice for All Reauthorization Act of 2016, H.R. 2577, 114th Cong. § 7 (2016). PREA is not mandatory but incentivizes compliance through grants under the Spending Clause of Article I. See id. Courts have generally held PREA gives prisoners no private right of action. See, e.g., Peralta v. Swetella, 2018 WL 6334723 (E.D. Cal. Dec. 5, 2018); Faz v. N. Kern State Prison, 2011 WL 4565918 (E.D. Cal. Sep. 28, 2011); Inscoe v. Yates, 2009 WL 3617810 (E.D. Cal. Oct. 27, 2009).

[6]      LGBTQI stands for lesbian, gay, bisexual, transgender, queer, and intersex individuals.

4

421 (1969).  However, legally conclusory statements, not supported by actual factual allegations, need not be accepted.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).  In addition, pro se pleadings are held to a less stringent standard than those drafted by lawyers.  See Haines v. Kerner, 404 U.S. 519, 520 (1972).

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  However, in order to survive dismissal for failure to state a claim under Rule 12(b)(6), a complaint must contain more than "a formulaic recitation of the elements of a cause of action;" it must contain factual allegations sufficient "to raise a right to relief above the speculative level."  Id. at 555-56.  The complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief."  Id. (quoting Twombly, 550 U.S. at 557).

In deciding a Rule 12(b)(6) motion, the court generally may not consider materials outside the complaint and pleadings.  See Cooper v. Pickett, 137 F.3d 616, 622 (9th Cir. 1998); Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994).  The court may, however, consider: (1) documents whose contents are alleged in or attached to the complaint and whose authenticity no party questions, see Branch, 14 F.3d at 454; (2) documents whose authenticity is not in question, and upon which the complaint necessarily relies, but which are not attached to the complaint, see Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001); and (3) documents and materials of which the court may take judicial notice, see Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994).

Finally, leave to amend must be granted "[u]nless it is absolutely clear that no amendment can cure the defects." Lucas v. Dep't of Corr., 66 F.3d 245, 248 (9th Cir. 1995) (per curiam); see also Lopez v. Smith, 203 F.3d 1122, 1126 (9th Cir. 2000) (en banc).

**B.** **Analysis**

Defendants move to dismiss Plaintiff's first amended complaint on the following grounds: (1) Plaintiff fails to meet the pleading standards of Federal Rule of Civil Procedure 8; (2) Plaintiff has failed to exhaust her administrative remedies for her Eighth Amendment claim; (3) Plaintiff fails to state a claim for relief under the First, Eighth, or Fourteenth Amendments; (4) Defendants are immune from suit; (5) Plaintiff's claims for injunctive relief are moot; and (6) Plaintiff lacks standing under PREA. For the reasons discussed below, Defendants' motion to dismiss should be granted in part and denied in part and Plaintiff should be granted leave to amend.

1. Rule 8

Federal Rules of Civil Procedure require that complaints contain a ". . . short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This means that claims must be stated simply, concisely, and directly. See McHenry v. Renne, 84 F.3d 1172, 1177 (9th Cir. 1996) (referring to Fed. R. Civ. P. 8(e)(1)). These rules are satisfied if the complaint gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. See Kimes v. Stone, 84 F.3d 1121, 1129 (9th Cir. 1996). Because the plaintiff must allege with at least some degree of particularity overt acts by specific defendants which support the claims, vague and conclusory allegations fail to satisfy this standard. Additionally, it is impossible for the court to conduct the screening required by law when the allegations are vague and conclusory. The Ninth Circuit has held that an overly detailed complaint is valid if it is "organized, [and is] divided into a description of the parties, a chronological factual background, and a presentation of enumerated legal claims, each of which lists the liable defendants and the legal basis therefor." Heams v. San Bernadino Police Dept., 530 F.3d 1124, 1132 (9th Cir. 2008).

///

Here, Defendants argue it is difficult to decipher what claims Plaintiff raises against which Defendants among the thirty-one pages of "legal arguments, citations, and irrelevant facts." ECF No. 27, p. 14-15. Specifically, Defendants take issue with portions of the complaint referencing Plaintiff's abuse at other prisons. See id. at 15.

These arguments are unconvincing. The length of Plaintiff's first amended complaint is not, without more, a valid basis for dismissal. See Heams, 530 F.3d at 1131 ("[V]erbosity or length is not by itself a basis for dismissing a complaint based on Rule 8(a)"). As to the level of detail, the Court finds the first amended complaint follows a logical order and clearly enumerates the claims and Defendants against whom Plaintiff attaches liability. The Court also finds relevance in Plaintiff's allegations regarding her experiences at other CDCR prisons because these facts relate to her claim of systematic discrimination throughout the prison system and her prayer for injunctive relief. For these reasons, the first amended complaint satisfies Rule 8.

2.    Exhaustion

Prisoners seeking relief under § 1983 must exhaust all available administrative remedies prior to bringing suit. See 42 U.S.C. § 1997e(a). This requirement is mandatory regardless of the relief sought. See Booth v. Churner, 532 U.S. 731, 741 (2001) (overruling Rumbles v. Hill, 182 F.3d 1064 (9th Cir. 1999)). Because exhaustion must precede the filing of the complaint, compliance with § 1997e(a) is not achieved by exhausting administrative remedies while the lawsuit is pending. See McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002).

The Supreme Court addressed the exhaustion requirement in Jones v. Bock, 549 U.S. 199 (2007), and held: (1) prisoners are not required to specially plead or demonstrate exhaustion in the complaint because lack of exhaustion is an affirmative defense which must be pleaded and proved by the defendants; (2) an individual named as a defendant does not necessarily need to be named in the grievance process for exhaustion to be considered adequate because the applicable procedural rules that a prisoner must follow are defined by the particular grievance process, not by the PLRA; and (3) the PLRA does not require dismissal of the entire

complaint if only some, but not all, claims are unexhausted. The defendant bears the burden of showing non-exhaustion in the first instance. See Albino v. Baca, 697 F.3d 1023 (9th Cir. 2012). If met, the plaintiff then bears the burden of showing that the grievance process was not available, for example, because it was thwarted. See id. The Supreme Court also held in Woodford v. Ngo that, to exhaust administrative remedies, the prisoner must comply with all of the prison system's procedural rules so that the agency addresses the issues on the merits. 548 U.S. 81, 89-96 (2006). Thus, exhaustion requires compliance with "deadlines and other critical procedural rules." Id. at 90. Partial compliance is not enough. See id.

A prison inmate in California satisfies the administrative exhaustion requirement by following the procedures set forth in §§ 3084.1-3084.8 of Title 15 of the California Code of Regulations. In California, inmates "may appeal any policy, decision, action, condition, or omission by the department or its staff that the inmate . . . can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). The inmate must submit their appeal on the proper form and is required to identify the staff member(s) involved as well as describing their involvement in the issue. See Cal. Code Regs. tit. 15, § 3084.2(a). These regulations require the prisoner to proceed through three levels of appeal. See Cal. Code Regs. tit. 15, §§ 3084.1(b), 3084.2, 3084.7. A decision at the third formal level, which is also referred to as the director's level, is not appealable and concludes a prisoner's departmental administrative remedy. See id. Departmental appeals coordinators may reject a prisoner's administrative appeal for a number of reasons, including untimeliness, filing excessive appeals, use of improper language, failure to attach supporting documents, and failure to follow proper procedures. See Cal. Code Regs. tit. 15, §§ 3084.6(b). If an appeal is rejected, the inmate is to be provided clear instructions how to cure the defects therein. See Cal. Code Regs. tit. 15, §§ 3084.5(b), 3084.6(a). A rejection, even at the third level, does not satisfy the exhaustion requirement because it leaves the prisoner with available remedies to pursue. See id. § 3084.1(b).

/ / /

/ / /

/ / /

Challenges to a plaintiff's failure to exhaust are more appropriately raised in a motion for summary judgment under Federal Rule of Civil Procedure 56. See Albino v. Baca, 747 F.3d 1162, 1166 (9th Cir. 2014). However, defendants may challenge exhaustion in a Rule 12(b)(6) motion if the rare circumstance arises where the failure to exhaust is "clear from the face of the complaint." Id.

Here, Defendants raise three arguments related to exhaustion. First, Defendants contend the face of Plaintiff's original complaint demonstrates a failure to exhaust because Plaintiff did not explicitly allege that she resubmitted her appeal after it was rejected at the third level. Second, Defendants argue Plaintiff failed to exhaust because she did not identify Defendant Santos in her grievance relating to the dining hall incident. Third, Defendants contend Plaintiff's allegation that her appeal was improperly rejected is misleading. The Court is unpersuaded as to any of these contentions.

Defendants' arguments rely heavily on Plaintiff's original complaint. The Court, however, dismissed the original complaint with leave to amend. See ECF No. 11, p. 7. Plaintiff's first amended complaint, now before the Court, supersedes her original complaint. See Ferdik v. Bonzelet, 963 F.2d 1258, 1262 (9th Cir. 1992). Therefore, Defendants cannot cite deficiencies from Plaintiff's original complaint in support of their motion to dismiss the first amended complaint. Defendants' arguments also fail because Plaintiff alleges in the first amended complaint that she exhausted her administrative remedies. In pointing out Plaintiff's failure to actively plead that she resubmitted her final appeal, Defendants have misconstrued the exhaustion requirement, and inappropriately shifted their burden to establish an affirmative defense to Plaintiff. Exhaustion is not a jurisdictional requirement for bringing an action. See Rumbles, 182 F.3d at 1067-68, overruled on other grounds by Booth, 532 U.S. 731. It is sufficient that Plaintiff has alleged she exhausted available administrative remedies.

Because Plaintiff alleges to have exhausted her remedies, accepting either of Defendants' remaining arguments would require the Court to consider extrinsic evidence. In particular, Defendants ask the court to make a factual determination – whether plaintiff resubmitted her grievance. Doing so would be improper at this stage of the pleadings. That

Defendants have failed to demonstrate Plaintiff's failure to exhaust is evident from the face of her first amended complaint. To the extent Defendants contend facts not apparent on the face of the first amended complaint demonstrate otherwise, such contention is more appropriately raised in the context of a motion for summary judgment such that the Court may consider extrinsic evidence.

### 3. Failure to State a Claim

Defendants argue Plaintiff's first amended complaint fails to state a claim under the First, Eighth, or Fourteenth Amendments.[7]

### a. Eighth Amendment Claims

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).

Under these principles, prison officials have a duty to take reasonable steps to protect inmates from physical abuse. See Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir. 1982); Farmer, 511 U.S. at 833. Liability exists only when two requirements are met: (1) objectively, the prisoner was incarcerated under conditions presenting a substantial risk of serious harm; and (2) subjectively, prison officials knew of and disregarded the risk. See Farmer, 511 U.S. at 837. The very obviousness of the risk may suffice to establish the knowledge element. See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995). Prison officials are not liable, however, if evidence is presented that they lacked knowledge of a safety risk. See Farmer, 511 U.S. at 844. The knowledge element does not require that the plaintiff prove that prison officials

---

[7] Plaintiff raises Fourteenth Amendment due process and equal protection claims. Each is discussed separately below.

know for a certainty that the inmate's safety is in danger, but it requires proof of more than a mere suspicion of danger.  See Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986).  Finally, the plaintiff must show that prison officials disregarded a risk.  Thus, where prison officials actually knew of a substantial risk, they are not liable if they took reasonable steps to respond to the risk, even if harm ultimately was not averted.  See Farmer, 511 U.S. at 844.

Here, Plaintiff alleges Defendant Santos knew of the threat made by Plaintiff's ex-boyfriend and failed to take reasonable action.  See ECF No. 17, p. 11.  This led to the bodily harm Plaintiff suffered in the dining hall incident.  See id.  Furthermore, Plaintiff argues Defendant Santos heard the assault and failed to intervene, resulting in harm to Plaintiff.  See id. Defendants argue Plaintiff fails to adequately allege Defendant Santos knew of the risk facing Plaintiff or that he disregarded it.  See ECF No. 27, p. 17-18.  The Court does not agree, and finds Plaintiff adequately states a cognizable Eighth Amendment claim against Defendant Santos.

Turning first to Defendant Santos's failure to take Plaintiff's safety concerns seriously, Plaintiff sufficiently alleges both the objective and subjective requirements of a deliberate indifference claim.  As a transgender woman, Plaintiff objectively faced elevated risks of sexual and physical violence.  See ECF No. 17, p. 3, 21.  Given this vulnerability, Plaintiff's concerns over her ex-boyfriend surpass the point of speculative harm.  Because Plaintiff communicated these concerns and her turbulent history with her ex-boyfriend to Defendant Santos, the first amended complaint sufficiently alleges he was aware of these risks and failed to take any action.[8]

/ / /

/ / /

/ / /

---

[8]    Defendants argue Defendant Santos did not have knowledge of Plaintiff's transgender status. This argument is unconvincing for two reasons. First, the first amended complaint alleges Plaintiff identifies as transgender and presents as a woman and Plaintiff's status as transgender is not a disputed issue in this case. Second, Plaintiff's claim would still have merit even if she were not transgender because she expressed a legitimate concern for her safety that was subsequently ignored. Defendants further argue Defendant Santos's intent to file a report indicates he took Plaintiff's concerns seriously. However, construing any ambiguity in Plaintiff's favor, the first amended complaint demonstrates Defendant Santos was deliberately indifferent because he ultimately failed to take reasonable precautions.

1    Turning next to Defendant Santos's failure to intervene in the dining hall incident,

2    Defendants assert Plaintiff does not properly allege the subjective prong of her claim because

3    there is no suggestion that Defendant Santos knew Plaintiff, and not one of the many other

4    inmates present in the dining hall at the time, was the victim of the attack. This argument

5    assumes a prison official's duty to protect an inmate only arises if he knows the exact identity of

6    the person in need. This Court rejects this argument.

7    The first amended complaint sufficiently alleges Defendant Santos heard the

8    commotion from the dining hall and was aware of an objectively obvious need for intervention.

9    In spite of this commotion, Defendant Santos took no action. Courts in this district have held a

10   prison official's failure to intervene against an attack can support a showing of deliberate

11   indifference. See Keel v. A Hedgpeth, 2009 WL 321333 (E.D. Cal. Feb. 9, 2009) (holding

12   deliberate indifference may be present where the facts show a guard watches an attack, was aware

13   of the risks presented by the attack and then did nothing, fired no shots, and waited for the attack

14   to stop); Elroy v. Cox, 2011 U.S. Dist. LEXIS 69319 (E.D. Cal. June 23, 2011) (denying

15   summary judgment and holding a genuine issue of material fact existed as to whether a

16   correctional officer who witnessed another using excessive force and failed to intervene is

17   deliberately indifferent). While the officials in these cases witnessed an attack, several districts

18   have indicated their willingness to accept sound as an acceptable means of inferring an official's

19   subjective knowledge. See, e.g., Collins v. Cty. of Kern, 390 F. Supp. 2d 964 (E.D. Cal. 2005)

20   (granting summary judgment against prisoner's eighth amendment claim because there was no

21   evidence defendant heard or saw the attacks on plaintiff); Drouin v. Contra Costa Cty., 2017 U.S.

22   Dist. LEXIS 50750 (N.D. Cal. Apr. 3, 2017) (granting motion to dismiss because the complaint

23   did not allege defendant had any knowledge of the injury that prompted the cries for help,

24   whether by hearing the bone being broken or because plaintiff informed defendant Rodriguez that

25   her femur was broken).

26   / / /

27   / / /

28   / / /

As alleged, Plaintiff faced a substantial risk of serious harm during the dining hall incident. Indeed, she suffered brutal injuries at the hands of her attacker. The Court also finds the first amended complaint sufficiently alleges Defendant Santos, through the commotion and his presence nearby, knew of the need for intervention yet took no action. Thus, Plaintiff has stated a cognizable Eighth Amendment claim against Defendant Santos.

b.       Fourteenth Amendment Due Process Claims

The Due Process Clause protects prisoners from being deprived of life, liberty, or property without due process of law. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In order to state a claim of deprivation of due process, a plaintiff must allege the existence of a liberty or property interest for which the protection is sought. See Ingraham v. Wright, 430 U.S. 651, 672 (1977); Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972). Due process protects against the deprivation of property where there is a legitimate claim of entitlement to the property. See Bd. of Regents, 408 U.S. at 577. Protected property interests are created, and their dimensions are defined, by existing rules that stem from an independent source – such as state law – and which secure certain benefits and support claims of entitlement to those benefits. See id.

Liberty interests can arise both from the Constitution and from state law. See Hewitt v. Helms, 459 U.S. 460, 466 (1983); Meachum v. Fano, 427 U.S. 215, 224-27 (1976); Smith v. Sumner, 994 F.2d 1401, 1405 (9th Cir. 1993). In determining whether the Constitution itself protects a liberty interest, the court should consider whether the practice in question ". . . is within the normal limits or range of custody which the conviction has authorized the State to impose." Wolff, 418 U.S. at 557-58; Smith, 994 F.2d at 1405. Applying this standard, the Supreme Court has concluded that the Constitution itself provides no liberty interest in good-time credits, see Wolff, 418 U.S. at 557; in remaining in the general population, see Sandin v. Conner, 515 U.S. 472, 485-86 (1995); in not losing privileges, see Baxter v. Palmigiano, 425 U.S. 308, 323 (1976); in staying at a particular institution, see Meachum, 427 U.S. at 225-27; or in remaining in a prison in a particular state, see Olim v. Wakinekona, 461 U.S. 238, 245-47 (1983).

///

///

1    　　　　In determining whether state law confers a liberty interest, the Supreme Court has

2    adopted an approach in which the existence of a liberty interest is determined by focusing on the

3    nature of the deprivation.  See Sandin v. Connor, 515 U.S. 472, 481-84 (1995).  In doing so, the

4    Court has held that state law creates a liberty interest deserving of protection only where the

5    deprivation in question: (1) restrains the inmate's freedom in a manner not expected from the

6    sentence; and (2) "imposes atypical and significant hardship on the inmate in relation to the

7    ordinary incidents of prison life."  Id. at 483-84.  Prisoners in California have a liberty interest in

8    the procedures used in prison disciplinary hearings where a successful claim would not

9    necessarily shorten the prisoner's sentence.  See Ramirez v. Galaza, 334 F.3d 850, 853, 859 (9th

10   Cir. 2003) (concluding that a due process challenge to a prison disciplinary hearing which did not

11   result in the loss of good-time credits was cognizable under § 1983); see also Wilkinson v.

12   Dotson, 544 U.S. 74, 82 (2005) (concluding that claims which did not seek earlier or immediate

13   release from prison were cognizable under § 1983).

14   　　　　　　　　　　i.　　　Defendants Diaz and Fox

15   　　　　Plaintiff argues Defendants Diaz and Fox, by their failure to implement certain

16   PREA standards aimed at protecting LGBTQI inmates from physical and sexual violence,

17   violated Plaintiff's due process rights by negatively impacting her right to be free from cruel and

18   unusual punishment.  See ECF No. 30, p. 25.  Plaintiff further contends she experienced an

19   atypical and significant hardship from "disparate processes, policies, practices, or conditions that

20   make [her] more vulnerable to sexual and physical assault; disparate housing; disparate

21   discipline; placement in solitary confinement; reduced educational and work programming; and

22   longer sentences."  See id.

23   　　　　Defendants argue Plaintiff has not clearly asserted a liberty interest arising from

24   either the Constitution or state law.  To the extent Plaintiff alleges a liberty interest in certain

25   housing options, the ability to work, and educational programming, Defendants contend Plaintiff

26   raises no valid liberty interests.  The Court agrees.  See Sandin, 515 U.S. at 485-68 (holding

27   prisoners do not have a liberty interest in remaining in general population); Walker v. Gomez,

28   370 F.3d 969, 973 (9th Cir. 2004) (reasoning the Due Process Clause of the Fourteenth

14

1    Amendment does not create a liberty interest in prison employment); Hernandez v. Johnston, 833

2    F.2d 1316, 1319 (9th Cir. 1987) (stating prisoners have no liberty interest in accessing

3    educational classes).

4           During the hearing, Plaintiff clarified her intent to allege a procedural due process

5    claim arising from the procedures outlined in PREA. A procedural due process claim, however,

6    still requires an underlying protected liberty interest, which the Court is unable to identify. See

7    Ingraham v. Wright, 430 U.S. 651, 672-73 (1977); Jackson v. Carey, 353 F.3d 750, 755 (9th Cir.

8    2003). Plaintiff would have this Court hold that PREA creates a protected liberty interest. This

9    Court, however, is not aware of any authority supporting this argument. While Plaintiff alleges

10   PREA is "explicit about the liberty interest the procedures it sets forth are designed to protect,"

11   PREA is a federal law and does not mandate compliance from state prisons like CMF. Indeed,

12   compliance with PREA is enforced through a grant incentive. See Justice for All Reauthorization

13   Act of 2016, H.R. 2577, 114th Cong. § 7 (2016). To the extent states elect to forego the

14   incentives, PREA is advisory and not mandatory.

15          Additionally, Defendants argue Plaintiff's allegation that the failure to adopt

16   certain standards under PREA violated her due process right to be free from cruel and unusual

17   punishment possibly states an Eighth Amendment claim, not a due process claim. See ECF No.

18   32, p. 9. The Court agrees. Although a single harm can implicate more than one constitutional

19   right, where a constitutional claim is covered by a specific constitutional provision, the court must

20   analyze the claim under the standard appropriate to that specific provision, not under the broad

21   rubric of substantive due process. See County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998);

22   see also Graham v. Connor, 490 U.S. 386, 395 (1989) ("Where a particular Amendment provides

23   an explicit textual source of constitutional protection against a particular sort of government

24   behavior, that Amendment, not the more generalized notion of substantive due process, must be

25   the guide for analyzing these claims."). Here, Plaintiff insufficiently states a due process claim

26   because the failure to enact policies which would protect transgender inmates from violence at the

27   hands of other inmates is the exact sort of behavior against which the Eighth Amendment

28   provides a source of protection. See Whitley v. Albers, 475 U.S. 312, 327 (1986) (holding the

15

Due Process Clause affords a plaintiff asserting an excessive force claim no greater protection than does the Cruel and Unusual Punishments Clause); Wolff v. Hood, 242 F. Supp. 2d 811, 819 (D. Or. 2002) (holding plaintiff cannot assert a Fourteenth Amendment claim against officials for failing to protect him from other inmates).  Therefore, Plaintiff cannot assert a due process claim based on facts which implicate the Eighth Amendment.

Similarly, Defendants argue Plaintiff's allegations of disparate treatment reads more like an equal protection claim than a due process claim.  See ECF No. 32, p. 9.  To the extent she wishes to allege the failure to adopt certain PREA standards led to disparate treatment at CMF, Plaintiff's claim is subsumed by her equal protection claims against Defendants Diaz and Fox, discussed below.

In the alternative, Defendants argue Plaintiff's claim regarding her denied parole hearing and longer sentence are barred under Heck v. Humphrey because she has not alleged the outcome of any disciplinary hearing has been invalidated, expunged, or reversed by the grant of a writ of habeas corpus.  See 512 U.S. 477, 489 (1994).  However, Defendants misapply Heck.  A plaintiff's claim under § 1983 is only barred under Heck if a favorable judgment would "necessarily imply the invalidity of his conviction or sentence."  Id. at 486.  Here, Plaintiff's claim does not necessarily imply the invalidity of her conviction.  For example, Plaintiff's first amended complaint makes no mention of good time credits or loss thereof.  The parties' arguments both inappropriately assume the lack of parole hearing necessarily resulted in a longer sentence.

Regardless, Plaintiff still does not raise a protected liberty interest with respect to parole hearings.  The Supreme Court held there is no constitutional or inherent right of a convicted person to be released before the end of a valid sentence.  See Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1 (1979). The Ninth Circuit has restrictively interpreted Greenholtz and found state law creates a liberty interest in the granting of parole only where such law mandates release unless certain clearly-defined exceptions apply.  See Baumann v. Arizona Dep't of Corrections, 754 F.2d 841, 844 (9th Cir. 1985).  However, the United States Supreme Court stated that, in the parole context, a prisoner has received adequate process when he has

been given an opportunity to be heard and was provided a statement of the reasons why parole was denied.  See Swarthout v. Cooke, 562 U.S. 216, 220 (2011).  To the extent Plaintiff claims her denied parole hearing obstructed her due process rights, she fails to allege she was refused an opportunity to be heard or a statement regarding the basis of the denial.

Plaintiff's due process claims should be dismissed with leave to amend to plainly allege the existence of a valid liberty interest created by the Constitution or state law.

ii.     Defendants Hadrava and Santos

Plaintiff alleges Defendants Hadrava and Santos violated her due process rights by placing her in non-disciplinary solitary confinement in violation of PREA.  See ECF No. 17, p. 13.  According to Plaintiff, during her time in solitary confinement she suffered an "atypical and significant hardship" from medical complications arising from the injuries she sustained during the dining hall incident.  See ECF No. 30, p. 29.  In her opposition to Defendants' motion, Plaintiff also argues Defendant Hadrava and Santos's actions violated procedures in the CDCR Department Operations Manual by not affording her an opportunity for review by the Institutional Classification Committee for her placement or release from solitary confinement.  See id. at 28-29.

Defendants contend Plaintiff has failed to sufficiently allege an atypical and significant hardship because her placement in solitary confinement lasted for only eight days and was for her safety.  See ECF No. 27, p. 21-23.  Defendants also contend Plaintiff has not identified an underlying liberty interest for her procedural due process claim.  See id. at 21.  According to Defendants, while the Department Operations Manual grants review, inmates are only entitled to this procedure after ten days.  Because Plaintiff was released after eight days, any due process right afforded by the Department Operations Manual was neither implicated nor violated.

To the extent Plaintiff intends to allege a liberty interest to be free from solitary confinement, she fails to state a cognizable claim.  In Sandin, the Supreme Court discussed the ability of a state law to confer a liberty interest and held that disciplinary solitary confinement invokes certain due process rights.  See 515 U.S. at 485-86.  Sandin, however, is distinguished

from Plaintiff's case.  Here, Plaintiff's does not identify any relevant state law nor does she allege

placement in solitary confinement for disciplinary reasons.  See ECF No. 17, p. 13.  Thus,

Plaintiff has neither identified the source of her liberty interest nor established that protective

solitary confinement invokes procedural due process rights.

The Court also agrees that Plaintiff fails to show an atypical and significant

hardship under the Sandin factors.  In determining whether or not conditions impose an atypical

and significant hardship, the Ninth Circuit held:

> Three guideposts cited in Sandin's analysis, however, provide a helpful
> framework: 1) whether the challenged condition "mirrored those
> conditions imposed upon inmates in administrative segregation and
> protective custody," and thus comported with the prison's discretionary
> authority; 2) the duration of the condition, and the degree of restraint
> imposed; and 3) whether the state's action will invariably affect the
> duration of the prisoner's sentence. Sandin, 515 U.S. at 486-87; Keenan,
> 83 F.3d at 1089.
>
> Ramirez v. Galaza, 334 F.3d 850, 861 (9th Cir. 2003).

Here,  Plaintiff alleges she spent eight days in solitary confinement during which time she was

unable to receive medical treatment for her injuries.  Plaintiff does not establish how this

invariably impacted the length of her stay.  Plaintiff also does not allege how her treatment

differed from that which she would receive in general population.  If anything, Plaintiff's

concerns over her access to medical care read like a deliberate indifference claim under the

Eighth Amendment.  See ECF No. 30, p. 29.  For the reasons stated above, she cannot pursue this

claim under the Due Process Clause.

Plaintiff also cites her inability to access educational and work programming while

in segregation, but this does not rise to the level of atypical and significant hardship.  See

Thompson v. Torres, No. 17-00319 DKW-RLP, 2017 U.S. Dist. LEXIS 121248, at *13 (D. Haw.

Aug. 2, 2017) (holding lack of programs, classes, or social interaction does not meet the atypical

and significant standard).

/ / /

/ / /

/ / /

As to Plaintiff claim that she was entitled to review of her placement in solitary confinement and owed a review of her placement by the Institutional Classification Committee per CDCR's Department Operations Manual, Defendants argue Plaintiff has not stated a protected liberty interest. See ECF No. 27, p. 21. Furthermore, Defendants argue the Department Operations Manual requires review only after ten days of confinement. See ECF No. 17, p. 24. Here, Plaintiff was released after eight days. To the extent Plaintiff alleges the Department Operations Manual grants a liberty interest, she has not sufficiently alleged it was implicated because she was not housed in solitary confinement for the minimum 10-day period to invoke the procedures outlined in the Department Operations Manual. See ECF No. 30, p. 9. ("An inmate's placement in temporary segregation shall be reviewed by the Institutional Classification Committee (ICC) within ten days of receipt in the unit.").

c.    Fourteenth Amendment Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment requires every individual to be judged individually and receive equal justice under the law. Plyler v. Doe, 457 U.S. 202, 216 n.14 (1982). This has not, however, been held to mean that all individuals must receive equal treatment. The Supreme Court's tiered framework analyzes equal protection claims based on the type of classification at issue and the requisite level of justification. If a group of individuals is considered a suspect or quasi-suspect class, then the court applies either strict or intermediate scrutiny. Strict scrutiny has been historically reserved for fundamental rights and classifications based on race and national origin. See Loving v. Virginia, 388 U.S. 1, 18 (1967). Intermediate scrutiny, on the other hand, has been applied to sex-based classifications. See United States v. Virginia, 518 U.S. 515, 524 (1996).

The Supreme Court employs a four-factor test to determine whether a class qualifies as suspect or quasi-suspect thus meriting heightened scrutiny. Heightened scrutiny is appropriate when the class being discriminated against: (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is a "minority or is politically powerless." Windsor v. United States, 699 F.3d 169, 181 (2d Cir. 2012)

(listing the factors), <u>aff'd on other grounds</u>, 570 U.S. 744 (2013).

Once the court determines heightened scrutiny should apply, the plaintiff must show the defendants acted with an intent or purpose to discriminate against her based on her membership in a suspect or quasi-suspect class. <u>See</u> <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1998). As to transgender individuals, the Supreme Court has not yet determined the appropriate classification and level of scrutiny to apply. The Ninth Circuit first addressed the issue in 1977 in <u>Holloway v. Arthur Anderson & Co.</u>, 566 F.2d 659 (9th Cir. 1977). In <u>Holloway</u>, the Ninth Circuit refused to apply heightened scrutiny to transgender discrimination under the Equal Protection Clause because it did not consider transgenders to be a discrete and insular minority possessing immutable characteristics. <u>See</u> 566 F.2d at 663-64. Since 1977, <u>Holloway</u> has been abandoned in many jurisdictions, including the Ninth Circuit. As recognized by the Ninth Circuit, <u>Price Waterhouse v. Hopkins,</u> 490 U.S. 228 (1989), overruled <u>Holloway</u>. <u>See</u> <u>Schwenk v. Hartford</u>, 204 F.3d 1187, 1201 (9th Cir. 2000). Other cases have said <u>Holloway</u> is "no longer good law." <u>Norsworthy v. Beard</u>, 87 F. Supp. 3d 1104, 1118 (N.D. Cal. 2015). Courts have increasing applied the four <u>Windsor</u> factors to find transgender discrimination merits heightened scrutiny. This Court agrees.

i. <u>Level of Scrutiny</u>

The application of heightened scrutiny based on transgender status is consistent with case law in this circuit. <u>See</u> <u>Karnoski v. Trump</u>, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018) (holding transgender individuals are a suspect class warranting strict scrutiny);[9] <u>F.V. v. Barron</u>, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018) ("[T]ransgender people bear all of the

_____

[9] On appeal, the Ninth Circuit vacated and remanded the case finding the district court failed give appropriate deference to the President and the Department of Defense concerning a ban on transgender individuals serving in the military. <u>See</u> <u>Karnoski v. Trump</u>, 2019 U.S. App. LEXIS 17878, at *30-35 (9th Cir. June 14, 2019) (per curiam). The Ninth Circuit appears to support the lower court's application of the <u>Windsor</u> factors. The court ultimately held that, with proper military deference afforded, transgender service members require "something more than rational basis but less that strict scrutiny." <u>See id.</u> at *45. While the district court unequivocally held transgender individuals are "one of the most vulnerable groups in our society," the Ninth Circuit did not. Rather, the Ninth Circuit seemingly limited its opinion to transgender service members and the level of scrutiny required in the specific context of a transgender military ban. By limiting its holding to this specific context, while also seeming to endorse the <u>Windsor</u> factors, the Ninth Circuit provides limited guidance. The Ninth Circuit has not, however, expressly rejected the application of heightened scrutiny to transgender individuals.

1  characteristics of a quasi-suspect class and any rule developed and implemented by IDHW should

2  withstand heightened scrutiny review."); Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 (N.D.

3  Cal. 2015) (holding that discrimination based on transgender status qualifies as a suspect

4  classification because transgender individuals meet the indicia of a suspect or quasi-suspect

5  classification identified by the Supreme Court).  As discussed below, analysis of the Windsor

6  factors confirms the appropriateness of heightened scrutiny in this case.

7                             (a).      History of Discrimination

8              It is generally accepted that transgender individuals face an alarming rate of

9  discrimination, harassment, and violence.  See Jaime M. Grant et al., Injustice at Every Turn: A

10  Report of the National Transgender Discrimination Survey, Nat'l Center for Transgender

11  Equality (2011), available at https://www.transequality.org/sites/default/files/docs/resources/

12  NTDS_ Report.pdf; see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858

13  F.3d 1034, 1051 (7th Cir. 2017); Karnoski v. Trump, 2018 WL 1784464 (W.D. Wash. Apr. 13,

14  2018); F.V. v. Barron, 286 F. Supp. 3d 1131, 45 (D. Idaho 2018); Adkins v. City of N.Y., 143 F.

15  Supp. 3d 134, 139 (S.D.N.Y. 2015); M.A.B. v. Bd. of Educ., 286 F. Supp. 3d 704, 720 (D. Md.

16  2018); Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ., 208 F.Supp.3d 850,

17  874 (S.D. Ohio 2016); Evancho v. Pine-Richland Sch. Dist., 237 F.Supp.3d 267, 288 (W.D.Pa.

18  2017); Grimm v. Gloucester Cty. Sch. Bd., 302 F. Supp. 3d 730, 749 (E.D. Va. 2018).

19              The most recent and largest study to date on transgender discrimination gathered

20  data from over 27,000 respondents and found the majority of respondents who were out or

21  perceived as transgender while in K–12 experienced some form of mistreatment, including being

22  verbally harassed (54%), physically attacked (24%), and sexually assaulted (13%) because they

23  were transgender.  Further, 17% experienced such severe mistreatment that they left school as a

24  result. The Report of the 2015 U.S. Transgender Survey, Nat'l Center for Transgender Equality,

25  at 4 (2015), available at https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-

26  Dec17.pdf.

27  / / /

28  / / /

This discrimination continues into adulthood and in the workplace. One in six (16%) respondents who have been employed reported losing a job because of their gender identity or expression. See id. at 12. Overall, 30% of respondents who were employed in the year prior to the study reported being fired, denied a promotion, or experiencing some form of mistreatment related to their gender identity or expression. See id. at 13.

In the prison context, PREA "exposed heightened risk of sexual assault against LGBTQI prisoners and the atypical severity of punishments LGBTQI people face solely for being themselves." ECF No. 17, p. 4. In prison, transgender inmates are thirteen times more likely to be assaulted than other prisoners. See id. at 3. Indeed, Plaintiff's treatment while in CDCR facilities mirrors that of other transgender inmates and individuals generally. At CMF Plaintiff has been called a "faggot," an "abomination," and told she deserved her attack because of her femininity. See id. at 12, 14.

Not only does this Court recognize the frequency that transgender individuals face discrimination, but it also acknowledges the type of discrimination draws parallels to discrimination based on race or national origin. Despite holdings that transgender discrimination falls within sex-based discrimination under a theory of gender-nonconformity, the above comments directed at Plaintiff reflect the deeper animosity that many hold against transgender individuals.[10] That is, transgender persons are hated and discriminated against for their very

---

[10]  Plaintiff argues transgender discrimination is subject to heightened scrutiny because discrimination against transgender individuals is form of discrimination based on gender non-conformity, which is a form of sex-based discrimination. This argument is supported by other courts. Several circuits have applied intermediate or heightened scrutiny to claims by transgender individuals under the Equal Protection Clause and Title VII on the theory that discrimination against transgender individuals is based on their failure to conform to typical gender norms. This form of sex-stereotyping was found unconstitutional by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), where a cisgender female successfully brought a Title VII claim after her employers failed to promote her because she was too masculine. Courts have subsequently applied this reasoning to transgender individuals. See, e.g., Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (holding that transgender plaintiff could state a claim under the Gender Motivated Violence Act when because discrimination for failing to conform to gender norms is a form of gender discrimination); Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Educ, 858 F.3d 1034, 1051 (7th Cir. 2017) (holding transgender plaintiff could state a claim for discrimination under the equal protection clause because discrimination based on transgender status is form of sex discrimination) ; Smith v. City of Salem, 378 F.3d 566, 575 (6th Cir. 2004) (holding discrimination against transgender individuals is a form of sex discrimination under Title VII).

being.  Here, Defendants' actions reflect the findings of the Federal Bureau of Investigation's 2017 Hate Crime Statistics which found 90% of hate crimes committed on the basis of gender-identity were motivated by an "anti-transgender bias."  See Hate Crime Statistics 2017, U.S. Department of Justice – Federal Bureau of Investigation, at 4 (2017), available at https://ucr.fbi.gov/hate-crime/2017/topic-pages/victims.pdf.  This is compared to only 10% of crimes committed against transgender persons for "anti-gender non-conforming bias."  See id.  This data suggests discrimination is leveled against transgender persons for being a discrete class of citizens far more often than for their failure to conform to traditional notions of gender.

### (b).  Contributions to Society

In Windsor, the U.S. Court of Appeals for the Second Circuit concluded "the aversion homosexuals experience has nothing to do with aptitude or performance."  Windsor v. United States, 699 F.3d 169, 182-83 (2d Cir. 2012).  The same can be said of discrimination leveled at transgender people.  This Court is not aware of any data suggesting that transgender persons are less productive members of society simply because they are transgender.

### (c).  Discrete and Immutable Characteristics

The Fourteenth Amendment is meant to protect citizens from discrimination based on circumstances beyond their control.  See Plyler, 457 U.S. at 216 n.14.  Indeed, transgender status is neither chosen or changeable, and at least two district courts have acknowledged the likelihood that gender identity is biologically determined.  See Doe v. McConn, 489 F. Supp. 76, 78 (S.D. Tex. 1980) ("These findings indicate that the transsexual has not made a choice to be as he is, but rather that the choice has been made for him through many causes preceding and beyond his control"); Schroer v. Billington, 424 F. Supp. 2d 203, 213 n.5 (D.D.C. 2006) (describing androgen insensitivity syndrome, a genetic disorder occurring in approximately 1 out of every 20,000 genetic males where an individual with "male" chromosomes and testes does not respond to the hormones the testes produce and thus typically has a female sexual identity and

---

This Court believes, however, that labeling discrimination against transgender persons as a form of sex-based discrimination does not accurately represent the nature of the discrimination leveled against them. As the Court discusses, transgender persons merit their own suspect classification under Windsor. The first amended complaint addresses this argument in the alternative. See ECF No. 17, p 26.

appears feminine).

Given the discrimination transgender individuals face, it is illogical to assert that a person would actively choose this "lifestyle."  See Hernandez-Montiel v. Immigration & Naturalization Serv., 225 F.3d 1084, 1095 (9th Cir. 2000) (stating a transgender asylum applicant's female sexual identity "must be fundamental, or [s]he would not have suffered this persecution and would have changed years ago").  Several district courts have already held gender identity to be an immutable characteristic.  See, e.g., Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 n.8 (N.D. Cal. 2015); Evancho v. Pine-Richland Sch. Dist., 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); Bd. of Educ. v. U.S. Dep't of Educ., 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); Adkins v. City of N.Y., 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).  Additionally, transgender individuals can be discretely defined based on the disparity between the gender they identify with and the traditional gender associated with their birth sex.

(d).     Politically Powerless Minority

Transgender people are a clear minority.  Research estimates transgender individuals make up less than 1% of the population.  See Doe v. Trump, 275 F. Supp. 3d 167, 209 (D.D.C. 2017) (referencing an amicus party's estimate that transgender people make up approximately 0.6% of the U.S. adult population); Bd. of Educ, 208 F. Supp. 3d at 874 (describing transgender people as "a tiny minority of the population").

As such a small minority, transgender persons are underrepresented and have not gained positions of significant power. To this Court's knowledge, no acknowledged transgender person has ever held a significant position in Congress or the federal judiciary.  See Adkins, 143 F. Supp. 3d at 140 ("[T]here is no indication that there have ever been any transgender members of the United States Congress or the federal judiciary."); M.A.B. v. Bd. of Educ., 286 F. Supp. 3d 704, 721 (D. Md. 2018) ("Only two openly transgender candidates have ever been elected; both won seats in a state legislature"). In addition to being underrepresented, transgender people are severely limited in their ability to attract the attention of lawmakers.  Federal courts have had to block the federal government and state legislatures from enforcing laws that violated the rights of

/ / /

transgender individuals.  See Stone v. Trump, 280 F. Supp. 3d 747 (D. Md. 2017) (enjoining the enforcement of President Trump's ban on transgenders in the military because it likely violated their rights under the Equal Protection Clause).

Transgender persons also lack political power relative to gay, lesbian, and bisexual individuals.  In 2010, for example, Congress repealed the "Don't Ask Don't Tell" policy for lesbian, gay, and bisexual people.  See Don't Ask, Don't Tell Repeal Act of 2010, Pub. L. No. 111-321, 124 Stat. 3515 (2010).  Today, transgender status is still a basis for denying admission into the armed forces or for discharging current service members.  See Karnoski, 2018 WL 1784464, at *20-22.

### ii.      Application of Heightened Scrutiny

Having concluded that discrimination based on transgender status warrants heightened scrutiny, the question remains whether, under this standard, Plaintiff sufficiently alleges discrimination based on her transgender status.  The gravamen of Defendants' motion to dismiss is that Plaintiff fails to allege that she was treated differently from similarly situated individuals.  Without expressly stating a standard of scrutiny, Defendants' argument presupposes that discrimination against transgender individuals merits a rational basis of review. For the reasons discussed above, this Court cannot agree because heightened scrutiny applies.

### (a).     Defendant Diaz

Plaintiff argues Defendant Diaz discriminated against her by failing to enact PREA policies intending to protect LGBTQI inmates from physical and sexual violence but enacted other policies benefitting other vulnerable populations such as prisoners of certain ages or those with mental illnesses.  See ECF No. 17, p. 22.  Defendants contend Plaintiff fails to allege an equal protection claim because the allegations do not show how similarly situated transgender inmates received disparate treatment.  See ECF No. 27, p. 19.  Defendants further assert Plaintiff insufficiently connects Defendant Diaz with the policies in place at CMF.  See id.  While these arguments are unpersuasive, Plaintiff has nonetheless failed to state a cognizable equal protection claim against Defendant Diaz.

/ / /

Despite Defendants' contentions, Plaintiff adequately ties Defendant Diaz to the failure to implement PREA policies. Defendant Diaz allegedly has the ultimate authority over the CDCR, including the administration and implementation of policies and procedures. See ECF No. 17, p. 5. Because Plaintiff seeks to enjoin Defendant Diaz to adopt certain PREA policies, he is an appropriate defendant for this claim. See, e.g., Pouncil v. Tilton, 704 F.3d 568, 576 (9th Cir. 2012) (holding CDCR Secretary is the proper defendant for claims of injunctive relief from prison regulations because he would be responsible for ensuring injunctive relief would be carried out, notwithstanding his lack of personal involvement in challenged conduct).

Plaintiff, however, does not allege Defendant Diaz purposely discriminated against transgender individuals by his failure to enact policies concerning LGBTQI inmates under PREA. Without speaking to the motivation behind this act, Plaintiff appears to assert a disparate impact claim. Allegations of disparate impact, without more, do not adequately support a cognizable Equal Protection violation claim. See Washington v. Davis, 426 U.S. 229, 242 (1976). While Plaintiff need not allege discriminatory purpose entirely motived Defendant Diaz's actions, Plaintiff must still assert discriminatory intent motivated Defendant Diaz's decision not to implement certain standards of PREA. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977). Plaintiff's first amended complaint alleges transgender inmates receive fewer protections than other vulnerable inmates without articulating discriminatory motivation behind this disparity. Thus, Plaintiff has insufficiently stated her claim against Defendant Diaz. [11]

/ / /

/ / /

/ / /

_____

[11] The Court rejects Defendants' suggestion that an equal protection analysis compares the treatment persons within the same class receive. The proper standard is whether transgender inmates receive the same treatment as other inmates in general, not other transgender inmates in particular. Accepting Defendants' formulation would lead to the absurd result that no specific class of people could ever experience discrimination as long as all individuals in that class are treated the same. In other words, Defendants would have the court hold that, so long as all transgender inmates are treated the same albeit differently than cisgender inmates, it would be acceptable to treat them differently. The Court declines to so hold.

(b).    Defendants Fox and Tileston

Plaintiff alleges Defendants Fox and Tileston failed to implement LGBTQI standards and permitted staff to discriminate against Plaintiff and other LGBTQI inmates.  See id. at 26.  Plaintiff also contends Defendants Fox and Tileston did not consider Plaintiff's PREA-compliant Transgender Biannual Assessment or her perception of safety when selecting her housing, as required by PREA.  See id.  Plaintiff' also argues Defendants Fox and Tileston orchestrated her transfer out of CMF and failed to intervene in their subordinates' discrimination. See ECF No. 32, p. 11.  Defendants argue Plaintiff fails to show invidious intent including how Defendants Fox or Tileston personally participated in discriminatory conduct or knew of Plaintiff's grievances.  See ECF No. 27, p. 12.  To the extent Plaintiff asserts supervisory liability, Defendants argue she fails to show their participation in the alleged unconstitutional violations. See id.

Like Plaintiff's equal protection claim against Defendant Diaz, this Court finds Plaintiff has failed to articulate a discriminatory motive behind any of Defendant Fox or Tileston's alleged unconstitutional actions.  While Plaintiff alleges Defendants Fox and Tileston implemented and promulgated the prison's policies, see ECF No. 17, p. 5, and knew of her grievances, see id. at 14, she has not adequately alleged invidious intent.  Thus, Plaintiff fails to state a cognizable equal protection claim against these Defendants.

(c).    Defendants Hopper and Hadrava

Plaintiff alleges that Defendants Hopper and Hadrava discriminated against Plaintiff during their investigation of the dining hall incident by (1) insinuating that Plaintiff made herself a target, and (2) by the contention that Plaintiff's choice to be transgenderand her gender identity, specifically her femininity, caused and warranted the assault, See ECF No. 17, p. 12.

Defendants again argue Plaintiff has failed to show how Defendants treated her differently from other inmates.  However, Plaintiff need only show her status as a transgender individual was the basis of Defendants' discriminatory treatment.  Plaintiff has met this burden at this stage.  The first amended complaint sufficiently alleges Plaintiff's transgender status was the driving force behind Defendants Hopper and Hadrava's callous investigation, which they would

have conducted differently had Plaintiff not been transgender.  These allegations also sufficiently establish Defendants Hopper and Hadrava acted with discriminatory intent based on Plaintiff's status as a transgender individual.

(d).    Defendant Santos

Plaintiff claims her transgender status motivated Defendant Santos's deliberate indifference to her safety concerns and the dining hall attack.  See id. at 27.  Defendants argue Plaintiff has insufficiently pled her claim and has failed to establish Defendant Santos even knew Plaintiff was transgender.  See ECF No. 27, p. 19; ECF No. 32, p. 12.  Without addressing Defendants' latter argument,[12] this Court finds Plaintiff's claim does not establish discriminatory intent.

While Plaintiff's allegations sufficiently support an Eighth Amendment claim, she has not alleged her transgender status was the basis of Defendant Santos's inaction in either instance.  This is especially so with regards to the dining hall incident. Defendant Santos stood in a nearby hallway outside the dining hall and is not alleged to have known the identity of the attacked inmate.  Without this knowledge, the first amended complaint does not adequately support that Defendant Santos's actions were motived by Plaintiff's membership to a suspect classification.  During the hearing, Plaintiff appeared to argue Defendant Santos knew Plaintiff's identity based on his interactions with her two days prior.  That is, based on her safety concerns regarding her ex-boyfriend, he knew or should have known that she was the dining hall victim.  This Court finds this implausible based on the facts alleged.  Plaintiff should be given leave to amend.

(e).    Defendants Farmer and Gibbs

The first amended complaint asserts Defendant Farmer intentionally discriminated against Plaintiff by refusing to hire her in the library simply because of her transgender status.  See ECF No. 17, p. 15.  Defendant Farmer also removed Plaintiff from college courses because having a transgender student was "not a good look for" CMF.  See id. at 16.  As alleged, Plaintiff

_____

[12]    Plaintiff's transgender status is not disputed here. The first amended complaint alleges she identifies as a woman. While plaintiff ultimately fails to state a claim, defendant Santos's supposed ignorance of plaintiff's gender identity is not a valid basis for dismissal.

states a cognizable equal protection claim against Defendant Farmer.

Plaintiff also states a cognizable claim against Defendant Gibbs, who made transphobic comments and publicly strip-searched Plaintiff in front of other inmates, despite her request to have a female officer perform the searches.  See id. at 15, 17.  Defendants argue these events do not demonstrate discriminatory intent and fail to distinguish Plaintiff's treatment from the treatment of others.  See ECF No. 27, p. 20.  Furthermore, Defendants assert verbal harassment is insufficient to constitute a claim under § 1983.  See ECF No. 32, p. 12.

The first amended complaint shows Defendant Gibbs harbored animosity towards Plaintiff based on her transgender status.  For example, Defendant Gibbs stated he wished he had been present for the dining hall incident, which he said Plaintiff deserved because she was a "faggot."  ECF No. 17, p. 17.  Although derogatory remarks alone are inadequate to support claims under § 1983, see Freeman v. Arpaio, 125 F.3d 732 (9th Cir. 1997) (holding abusive language directed at plaintiff's religious and ethnic background does not support a § 1983 claim); Clinton v. Geovenetti, 2013 WL 12377980 (C.D. Cal. June 10, 2013) (holding verbal abuse and derogatory remarks concerning plaintiff's homosexuality alone are insufficient to support a violation of the Equal Protection Clause for discrimination), here they support an inference of transgender animus.  Based on these allegations, this Court may plausibly infer the targeted strip searches were based on Defendant Gibbs's animosity towards transgender inmates in general and Plaintiff in particular.

d.    First Amendment Retaliation Claims

In order to state a claim under 42 U.S.C. § 1983 for retaliation, the prisoner must establish that he was retaliated against for exercising a constitutional right, and that the retaliatory action was not related to a legitimate penological purpose, such as preserving institutional security.  See Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).  In meeting this standard, the prisoner must demonstrate a specific link between the alleged retaliation and the exercise of a constitutional right.  See Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995); Valandingham v. Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989).  The prisoner must also show that the exercise of First Amendment rights was chilled, though not necessarily silenced, by

the alleged retaliatory conduct.  See Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir. 2000), see also Rhodes v. Robinson, 408 F.3d 559, 569 (9th Cir. 2005).  Thus, the prisoner plaintiff must establish the following in order to state a claim for retaliation: (1) prison officials took adverse action against the inmate; (2) the adverse action was taken because the inmate engaged in protected conduct; (3) the adverse action chilled the inmate's First Amendment rights; and (4) the adverse action did not serve a legitimate penological purpose.  See Rhodes, 408 F.3d at 568.

As to the chilling effect, the Ninth Circuit in Rhodes observed: "If Rhodes had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect." Id. at n.11.  By way of example, the court cited Pratt in which a retaliation claim had been decided without discussing chilling.  See id.  This citation is somewhat confusing in that the court in Pratt had no reason to discuss chilling because it concluded that the plaintiff could not prove the absence of legitimate penological interests.  See Pratt, 65 F.3d at 808-09.  Nonetheless, while the court has clearly stated that one of the "basic elements" of a First Amendment retaliation claim is that the adverse action "chilled the inmates exercise of his First Amendment rights," id. at 567-68, see also Resnick, 213 F.3d at 449, the comment in Rhodes at footnote 11 suggests that adverse action which is more than minimal satisfies this element.  Thus, if this reading of Rhodes is correct, the chilling effect element is essentially subsumed by adverse action.

In her first amended complaint, Plaintiff alleges several Defendants retaliated against her for grievances and her lawsuit filed against CMF staff.  See ECF No. 17, p. 16-21. Defendants argue Plaintiff fails to link Plaintiff's protected conduct and Defendants' alleged retaliations.  See ECF No. 27, p. 25-26.  Defendants' argument is unpersuasive.

Absent direct evidence, such as a confession by a defendant, the plaintiff may establish retaliatory motive by offering circumstantial evidence of: (1) temporal proximity between the protected speech and the alleged adverse action; (2) defendant's previous opposition to the protected conduct; or (3) other evidence that defendant's justification for the adverse action is false and pretextual.  See McCollum v. California Dep't of Corr. & Rehab., 647 F.3d 870, 882 (9th Cir. 2011).  This Court finds Plaintiff provides sufficient allegations to

establish causation between her protected conduct and the alleged unconstitutional conduct of Defendants.

i.      Defendant Cherniss

Plaintiff alleges several possible retaliatory actions by Defendant Cherniss. First, Defendant Cherniss filed an RVR and disciplinary report one month after Plaintiff filed a grievance related to "staff misconduct." See ECF No. 17, p. 16. Second, he issued Plaintiff a false citation for refusing to participate in her disciplinary hearing. See ECF No. 30, p. 22. Third, he found her guilty at this disciplinary hearing, which came with a multitude of restrictions. See id.

Defendants argue there is no allegation Defendant Cherniss knew of Plaintiff's lawsuit because a summons had not been issued when these events occurred. See ECF No. 32, p. 8. This contention, however, fails to consider Plaintiff's other forms of protected conduct.

As to the first potential retaliatory act, this Court finds there are insufficient allegations to infer a retaliatory motive for Defendant Cherniss's RVR and disciplinary report. Plaintiff fails to establish Defendant Cherniss knew of her protected conduct. While the Court may infer retaliatory intent from temporal proximity, it may not do so without a defendant's knowledge of the protected conduct. Plaintiff's allegation of a report for "staff misconduct" does not name Defendant Cherniss, so this Court cannot infer he knew of this grievance.

Turning next to the second and third potential retaliatory actions, Plaintiff states a cognizable claim. After Defendant Cherniss's first RVR, Plaintiff exercised her First Amendment right by filing a grievance against him. During her disciplinary hearing, it is plausible Defendant Cherniss knew of Plaintiff's grievance and the ongoing investigation against him or became aware when Plaintiff asked him to recuse himself from her hearing. These allegations permit this Court to infer retaliatory intent. Further, Defendant Cherniss's actions served no penological interest because, as alleged, there was no rational basis for the second citation against Plaintiff or for her guilty verdict. Thus, Plaintiff has adequately stated

/ / /

/ / /

all the necessary elements of a retaliation claim against Defendant Cherniss.[13]

ii.    <u>Defendant Ebert</u>

Plaintiff alleges Defendant Ebert cited Plaintiff for being disruptive when she asked for a more confidential setting for her attorney-client meeting. <u>See</u> ECF No. 17, p. 18. Defendants argue Plaintiff does not allege her legal visit caused the citation. <u>See</u> ECF No. 27, p. 26. Next, Plaintiff alleges Defendant Ebert stood within earshot of Plaintiff's meeting and threatened to place her attorneys on a "restricted" list. ECF No. 17, p. 18. Defendants assert listening to a prisoner's conversation is not an adverse action. <u>See</u> ECF No. 27, p. 26. The Court is unconvinced by Defendants' arguments.

Turning first to the causation argument, the complaint sufficiently establishes Defendant Ebert knew of Plaintiff's suit against CMF officials because of her role as litigation coordinator. Knowledge is also plausibly inferred from Defendant Ebert's eavesdropping. Beyond Defendant Ebert's knowledge of Plaintiff's protected conduct, the alleged retaliation occurred shortly after Plaintiff's exercise of her protected conduct. Finally, Defendant Ebert provided a pretextual justification for her actions. Plaintiff's head injuries from the dining hall attack left her hard of hearing. <u>See</u> ECF No. 17, p. 12-13. When placed in a room that permitted others to easily overhear her conversation with her attorneys, it was not disruptive for Plaintiff to ask for a more private location for her meeting. Thus, there is a causal connection between Plaintiff's right to file suit against Defendants and Defendant Ebert's actions.

Turning next to the adverse action requirement, Defendants' argument is even less convincing. Whether or not this Court is inclined to say that proximity to and eavesdropping on an inmate's conversation with her attorneys is adverse for purposes of a First Amendment claim, Defendant Ebert's conduct goes further. Defendant Ebert threatened to limit Plaintiff's access to her attorneys by placing them on a restricted list. <u>See</u> ECF No. 17, p.

---

[13]     There is no <u>Heck</u> issue presented by Plaintiff's challenge to Defendant Cherniss's guilty verdict in this action because it did not result in a loss of good time credits or otherwise affect the duration of her confinement. Plaintiff's First Amendment claim, therefore, is not barred by <u>Heck v. Humphrey</u>, 512 U.S. 477, 489 (1994).

18. This conduct had a potential chilling effect on Plaintiff's right to pursue legal action against CMF officials. See Brodheim v. Cry, 584 F.3d 1262, 1270-71 (9th Cir. 2009) ("[A] statement that 'warns' a person to stop doing something carries the implication of some consequence of a failure to heed that warning . . . . The power of a threat lies [in] . . . the apprehension it creates in the recipient"). For these reasons, Plaintiff states a valid First Amendment claim against Defendant Ebert.

### iii. Defendants Fox and Tileston

Plaintiff alleges Defendants Fox and Tileston pressured staff to search and discipline Plaintiff so she could be transferred to another institution. Defendants argue the first amended complaint does not support Defendants Fox and Tileston knew of Plaintiff's grievances or were personally involved in Plaintiff's retaliatory transfer. See ECF No. 27, p. 26.

Plaintiff does, however, allege Defendants Fox and Tileston, through their duties to review staff complaints and grievances, knew of Plaintiff's grievances and were the only ones with the authority to transfer Plaintiff. See ECF No. 17, p. 14. But these allegations do not sufficiently show Defendants Fox and Tileston acted in response to Plaintiff's protected conduct. In failing to present a causal connection between her protected conduct and the alleged retaliations, Plaintiff does not present a cognizable retaliation claim against Defendants Fox and Tileston.

### 4. Immunity

#### a. Qualified Immunity

Qualified immunity protects government officials from liability for civil damages where their discretionary decisions did not violate a clearly established constitutional or statutory right of which a reasonable person would have known. See Anderson v. Creighton, 483 U.S. 635, 638 (1987). It is meant to protect all but "the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335 (1986). The court must consider two questions: (1) taken in the light most favorable to the injured party, whether the facts show the alleged conduct violated a constitutional or statutory right and; (2) whether the alleged

33

1  deprived constitutional right was clearly established.

2         Regarding the second prong, the court must decide if existing case law provided

3  the defendant with an adequate warning that their conduct was unlawful.  See Flores v. Morgan

4  Hill Unified Sch. Dist., 324 F.3d 1130, 1137 (9th Cir. 2003).  However, "it is not necessary that

5  the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of

6  defendant's actions] was apparent in light of preexisting law."  Malik v. Brown, 71 F.3d 724,

7  727 (9th Cir. 1995).  That is, the lack of precedent may indicate the obviousness of the illegality

8  of the issue.  See id.

9         Although Defendants argue they are entitled to qualified immunity because no

10 constitutional violations occurred, Plaintiff has sufficiently alleged Eighth Amendment claims

11 against Defendants Santos; equal protection claims against Defendants Hopper, Hadrava,

12 Gibbs, Farmer; and First Amendment claims against Defendants Cherniss, Ebert, and Gibbs.

13 Plaintiff's claims invoke rights well established by the Constitution and case law.  Thus, these

14 Defendants are not entitled to qualified immunity at this stage of the pleadings.   At this time,

15 this Court declines to address Defendants' immunity to Plaintiff's deficient claims for which

16 the Court finds leave to amend to be appropriate.  A discussion of immunity as to such claims

17 is premature at this juncture.

18              b.     Eleventh Amendment Immunity

19        Defendants argue the Court should dismiss Plaintiff's claims for damages against

20 those sued in their official capacity under the Eleventh Amendment.  See ECF No. 27, p. 27.  The

21 Eleventh Amendment bars actions seeking damages from state officials acting in their official

22 capacities.  See Eaglesmith v. Ward, 73 F.3d 857, 859 (9th Cir. 1995); Pena v. Gardner, 976 F.2d

23 469, 472 (9th Cir. 1992) (per curiam).  The Eleventh Amendment does not, however, bar suits for

24 damages against state officials acting in their personal capacities or suits for prospective

25 declaratory or injunctive relief against state officials in their official capacities.  See id.; Ex Parte

26 Young, 209 U.S. 123 (1908); Armstrong v. Wilson, 124 F.3d 1019, 1025 (9th Cir. 1997).

27 / / /

28 / / /

Here, Plaintiff is not seeking damages from any Defendant sued only in his or her official capacity.  See id.  As Plaintiff correctly notes, the Eleventh Amendment does not "erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983." Hafer v. Melo, 502 U.S. 21, 30-31 1991 (quoting Scheuer v. Rhoes, 416 U.S. 232, 238 (1974)); see also Porter v. Jones, 319 F.3d 483, 491 (9th Cir. 2003).  Thus, Defendants' argument is unpersuasive.

### 5. Mootness

Article III of the U.S. Constitution limits courts from hearing moot cases.  See NAACP v. City of Richmond, 743 F.2d 1346, 1352 (9th Cir. 1984).  A case is moot if the "issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Murphy v. Hunt, 455 U.S. 478, 481 (1982) (citations omitted).  The test for mootness is whether the court can give the plaintiff any effective relief if it decides the matter on the merits in her favor.  See Garcia v. Lawn, 805 F.2d 1400, 1402 (9th Cir. 1986).  That is, whether the court can "undo" the effects of the alleged wrongdoing.  Id.  In the context of a prisoner's request for injunctive relief, transfer away from a particular facility without reasonable expectation of return generally moots a prisoner's claim against unconstitutional policies or conditions.  See Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam).

Defendants argue Plaintiff's request for injunctive relief specific to CMF is moot because she no longer resided there.  On July 5, 2019, the parties filed a stipulated notice of Plaintiff's transfer back to CMF.  See ECF No. 35.  Thus, Plaintiff's issues concerning CMF remain live in light of this development.

### 6. Standing Under PREA

Although neither the Supreme Court nor the Ninth Circuit has addressed the issue, this district has repeatedly held PREA gives no private right of action.  See Peralta v. Swetella, 2018 WL 6334723 (E.D. Cal. Dec. 5, 2018); Faz v. N. Kern State Prison, 2011 WL 4565918 (E.D. Cal. Sep. 28, 2011); Inscoe v. Yates, 2009 WL 3617810 (E.D. Cal. Oct. 27, 2009).  Defendants cite other cases from three other districts in the Ninth Circuit holding the same.  See ECF No. 27, p. 28. The Western District of Virginia appears to agree.  See Whitt v.

1  Yancey, 2015 WL 3456600, at *11 n.11 (E.D. Va. May 29, 2015) ("However, to the extent

2  Whitt seeks procedural — or, for that matter, substantive — due process under the PREA, any

3  such Fourteenth Amendment claim appears futile. 'Nothing in the PREA suggests that Congress

4  intended to create a private right of action for inmates to sue prison officials for noncompliance

5  with the Act.'" (quoting De'Lonta v. Clarke, 2012 WL 4458648, at *3-4 (W.D. Va. Sept. 11,

6  2012)))

7          Plaintiff frequently alleges particular Defendants acted in violation of PREA or

8  Plaintiff's PREA rights.  See, e.g., ECF No. 17, p. 11 (alleging Defendants violated her

9  Fourteenth Amendment right to due process by failing to enact LGBTQI standards under

10  PREA); id. at 18 (alleging Defendants Fox and Tileston retaliated against her in violation of

11  PREA); ECF No. 30, p. 28 (alleging Defendants Hadrava and Santos violated PREA and thus

12  Plaintiff's due process by placing her in non-disciplinary solitary confinement).  While

13  Defendants argue Plaintiff cannot pursue claims against Defendants for failing to comply with

14  or properly implement PREA, Plaintiff does not appear, however, to allege any claims directly

15  under PREA.  All claims fall under either the First, Eighth, or Fourteenth Amendments.  See

16  ECF No. 17, p. 25-30.  Therefore, the inability to sue directly under the PREA is irrelevant.

17

18              **III.  DISCUSSION – MOTION FOR MISJOINDER**

19      A.      **Applicable Legal Standard**

20          Federal Rule of Civil Procedure 21 states:

21              Misjoinder of parties is not a ground for dismissing an action.  On
               motion or on its own, the court may at any time, on just terms, add or drop
22             a party.  The court may also sever any claim against a party.

23          Fed. R. Civ. P. 21; See Mullaney v. Anderson, 342 U.S. 415, 417 (1952).

24          Severance under Rule 21 permits claims to proceed as discrete, independent suits

25  resulting in final judgments.  See Herklotz v. Parkinson, 848 F.3d 894, 898 (9th Cir. 2017).  In

26  deciding a motion for misjoinder, the court must consider whether an order under Rule 21 would

27  result in prejudice or undue delay.  See Pena v. McArthur, 889 F. Supp. 403, 407 (E.D. Cal.

28  1994).  The court must also consider the possibility of jury confusion.  See id. (denying plaintiff's

36

motion to join uninsured motorist in action against insurer, in part, because the jury might confuse evidence concerning uninsured motorist's negligence with the evidence demonstrating insurer's alleged breach of duty).  The moving party has the burden to show the interest of judicial economy should give way to protect that party's interest.  See Franklin Fueling Sys. v. Veeder-Root Co., 2009 U.S. Dist. LEXIS 107507 (E.D. Cal. Nov. 17, 2009).  The moving party must also show a substantial risk of harm from a coordinated trial; however, prejudice to the non-moving party will defeat a Rule 21 motion.  See Sable Commc'ns of Cal., Inc. v. Pac. Tel. & Tel. Co., 890 F.2d 184, 191 n.13 (9th Cir. 1989).

Although the meaning of misjoinder is not evident from the face of Rule 21, the meaning of the terms is made in reference to the rules governing joinder.  See Pan Am. World Airways, Inc. v. United States Dist. Court for Cent. Dist., 523 F.2d 1073, 1079-80 (9th Cir. 1975).  Federal Rule of Civil Procedure 20 permits joinder of multiple defendants if: (1) relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; (2) and there are common questions of law or fact among all defendants.  Fed. R. Civ. P. 20(a)(2).

Joinder is proper only if both the transactional relatedness and commonality requirements are satisfied.  See Desert Empire Bank v. Insurance Co. of N. Am., 623 F.2d 1371, 1375 (9th Cir. 1980) (holding Rule 20 imposes two specific requirements for permissive joinder).  Parties are misjoined when they fail to satisfy either of the preconditions for permissive joinder under Rule 20(a)(2).  See Pena, 889 F. Supp. at 405.  However, even if both elements are satisfied, district courts may refuse joinder to avoid prejudice and delay, ensure judicial economy, or protect principles of fundamental fairness.  See Visendi v. Bank of Am., N.A., 733 F.3d 863, 870 (9th Cir. 2013) (finding even when requirements of transactional relatedness and commonality are met, the district court must examine whether permissive joinder would comport with principles of fundamental fairness or would prejudice either side).  Joinder may be prejudicial if: (1) the defendant is embarrassed or confounded in his presentation of separate defenses; (2) the jury uses evidence of one claim to infer liability on a co-defendant of another claim; or (3) the jury cumulates the evidence and finds guilt when it would not if the claims were

37

presented separately.  See United States v. Johnson, 820 F.2d 1065, 1070 (9th Cir. 1987).  The Ninth Circuit has held claims with simple and distinct facts or evidence do not generally give rise to prejudice.  See Bean v. Calderon, 163 F.3d 1073, 1085 (9th Cir. 1998).

While there are no bright-line definitions of "transaction," "occurrence," or "series," transactional relatedness can refer to the "similarity in the factual background of the claims."  Coughlin v. Rogers, 130 F.3d 1348, 1350 (9th Cir.1997).  "Although there might be different occurrences, where the claims involve enough related operative facts, joinder in a single case may be appropriate."  Nguyen v. CTS Elecs. Mfg. Sols. Inc., 2014 WL 46553 (N.D. Cal. 2014).  To satisfy the commonality requirement, all questions need not be common to all joined parties.  The common question may be one of fact or law and need not be the most important or predominant issue in the litigation.  See id.

**B.**    **Procedural History**

Plaintiff initially filed a pro se complaint alleging Eighth Amendment claims against Defendants Santos, Fox, Hopper, and Hadrava.  See ECF No. 1.  The Court dismissed the complaint for failing the screening standard and gave Plaintiff leave to amend.  See ECF No. 11.  Plaintiff's first amended complaint, filed by retained counsel, raised additional First and Fourteenth Amendment claims and added Defendants Diaz, Ebert, Farmer, Cherniss, Tileston, and Does 1-3.  Defendants subsequently moved to dismiss Plaintiff's amended complaint and to sever her additional claims

**C.**    **Analysis**

Defendants' motion for misjoinder should be denied because Plaintiff's joinder has met the requirements of Rule 20.  Defendants have failed to show a significant risk of prejudice from joinder. On the contrary, severance would be inefficient and inequitable.

1.    Transactional Relatedness

Defendants argue Plaintiff's additional claims do not arise from the same transaction or occurrence as her Eighth Amendment claims.  Defendants concede, however, Plaintiff could join the Eighth Amendment claims against Defendants Santos and Does, the equal protection and due process claims against Defendant Santos, and the equal protection

1    claims against Defendants Hadrava and Does because they all concern the dining hall incident.

2    See ECF No. 33, p. 3. Next, Defendants argue the supervisory claims against Defendants Diaz,

3    Fox, and Tileston create a distinct grouping of claims.  See ECF No. 33, p. 4.  Third,

4    Defendants group the allegations against Defendants Cherniss, Ebert, and Farmer as distinct

5    individual claims unrelated to any pattern of events.

6            The first amended complaint explicitly alleges a pattern of discrimination

7    throughout the CDCR, including CMF.  Plaintiff sufficiently alleges discrimination in

8    Defendants' failure to enact PREA standards the absence of which precipitated the dining hall

9    attack.  As a result, Plaintiff filed grievances and Defendants subsequently retaliated against

10   her.  The discrete interactions with Defendants Cherniss, Farmer and Gibbs are additional

11   discriminatory events in this series.  Thus, Plaintiff's claims satisfy this prong of Rule 20.

12                   2.    Commonality

13           Defendants also argue Plaintiff's allegations of different constitutional

14   violations against different Defendants have no common questions of law or fact among them.

15   Plaintiff's failure to allege the same claim against all Defendants, however, does not preclude

16   her ability to join these claims.

17           Plaintiff alleges the failure to implement PREA underpins a transphobic culture

18   at CMF.  See ECF No. 31, p. 18.  Accepting this statement as true, as the Court must,

19   questions of law and fact concerning the propriety of PREA run common to all claims.

20                   3.    Equity

21           Defendants argue that even if Plaintiff meets the requirements of permissive

22   joinder, this Court should grant severance because joinder would not comport with notions of

23   fundamental fairness.  See ECF No. 28, p. 13.  Specifically, Defendants are concerned the

24   jurors will be unable to compartmentalize the evidence against specific Defendants.  See id.

25   They also argue the multitude of counts against varied combinations of Defendants will

26   confuse jurors struggling to discern who did what.  See id.

27   / / /

28   / / /

As to Defendants' concerns over bias and confusion, the Court has procedural safeguards at its disposal, such as tailored jury instructions and motions in limine, to account for these risks. Defendants have failed to demonstrate a substantial threat of harm by joinder of Plaintiff's claims. Further, severing Plaintiff's claim will stymy her ability to establish patterns of behavior and obtain injunctive relief from CDCR.

Defendants' motion also fails to show how severing Plaintiff's claims would best suit notions of efficiency. At the hearing, Defendants even conceded that joinder would promote efficiency. The Court agrees. Given the importance of the dining hall incident and PREA to Plaintiff's claims, severance would be an inefficient use of the parties' and the Court's time and resources.

## IV. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Defendants' motion for misjoinder (ECF No. 28) be DENIED;

2.      Defendants' motion to dismiss (ECF No. 27) be GRANTED in part and DENIED in part as follows:

      a.      Defendants' motion to dismiss Plaintiff's Eighth Amendment claims for failing to satisfy the pleading standards of Rule 8 be DENIED;

      b.      Defendants' motion to dismiss Plaintiff's Eighth Amendment claims for failing to exhaust her administrative remedies be DENIED;

      c.      Defendants' motion to dismiss for failure to state an Eighth Amendment claim against Defendant Santos be DENIED;

      d.      Defendants' motion to dismiss for failure to state an equal protection claim under the Fourteenth Amendment be DENIED with regards to Defendants Hopper, Hadrava, Gibbs, and Farmer;

      e.      Defendants' motion to dismiss for failure to state an equal protection claim under the Fourteenth Amendment be GRANTED with regards to Defendant Diaz, Santos, Fox, and Tileston;

1          f.      Defendants' motion to dismiss for failure to state a due process

2 claim under the Fourteenth Amendment be GRANTED with regards to Defendants Diaz, Fox,

3 Hadrava, and Santos;

4          g.      Defendants' motion to dismiss for failure to state a First

5 Amendment claim be DENIED with regards to Defendants Cherniss, Ebert, and Gibbs;

6          h.      Defendants' motion to dismiss for failure to state a First

7 Amendment claim be GRANTED with regards to Defendants Fox and Tileston;

8          i.      Defendants' motion to dismiss Plaintiff's claim as barred by

9 Eleventh and under qualified immunity be DENIED;

10          j.      Defendants' motion to dismiss Plaintiff's claims for injunctive

11 relief as moot be DENIED; and

12          3.      Plaintiff be granted leave to file a second amended complaint.

13          These findings and recommendations are submitted to the United States District

14 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 14 days

15 after being served with these findings and recommendations, any party may file written

16 objections with the Court. Responses to objections shall be filed within 14 days after service of

17 objections. Failure to file objections within the specified time may waive the right to appeal.  <u>See</u>

18 <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

19

20

21 Dated:  August 16, 2019

22                                  _____

                                   DENNIS M. COTA

23                                    UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28